DECISION AND JUDGMENT ENTRY
This is an appeal from a Washington County Common Pleas Court judgment in favor of Jeffrey N. Brookover and Susan Brookover, plaintiffs below and appellees/cross-appellants (appellees) herein.
Flexmag Industries, Inc., defendant below and appellant/cross-appellee (appellant) herein, raises the following assignments of error for review:
FIRST ASSIGNMENT OF ERROR:
 "IT WAS REVERSIBLE ERROR TO DENY THE MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT OF THE DEFENDANT FLEXMAG INDUSTRIES, INC."
SECOND ASSIGNMENT OF ERROR:
 "THE COURT COMMITTED REVERSIBLE ERROR IN ITS PRETRIAL AND TRIAL EVIDENTIARY RULINGS."
THIRD ASSIGNMENT OF ERROR:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ITS INCOMPLETE AND MISLEADING CHARGE TO THE JURY."
Appellees (and cross-appellants) raise the following cross-assignments of error:
FIRST CROSS-ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN NOT AWARDING PLAINTIFFS THEIR FULL CONTINGENT FEE."
SECOND CROSS-ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF OTHER NIP POINT INJURIES AT OTHER GROUP ARNOLD PLANTS."
THIRD CROSS-ASSIGNMENT OF ERROR:
 "DURING PREJUDGMENT INTEREST DISCOVERY PROCEEDINGS, THE TRIAL COURT ERRED IN NOT REQUIRING DEFENDANT'S INSURER TO TURN OVER ITS ENTIRE CLAIMS FILE."
On June 19, 1997, appellee's[1] hand became entangled in an inrunning nip point on a calendar machine located at appellant's facility. Appellee subsequently filed a complaint and alleged that appellant committed an intentional tort. Appellee's complaint asserted, inter alia, that appellee fell over a "stop bar" and his hand became entangled in the rollers of the calendar. This caused appellee to suffer a crushed right hand, third degree burns, and amputation of his second, third, fourth, and fifth fingers of his right hand.
On November 30, 1999, appellant filed a motion for summary judgment. In its motion, appellant argued that at the time of appellee's accident, appellee was working in an area where employees would not be present during the normal operation of the calendar. Appellant asserted:
"[Appellee] was engaged in a unique and temporary activity, and was in an area not normally used by operators of the calendar, and Flexmag could not, therefore, reasonably anticipate that injury was substantially certain to occur."
Appellant claimed in its motion that the particular nip point that caused appellee's injury is approximately forty-four inches above the floor. Thus, appellant reasoned, "[t]he location of the nip, itself, provided reassurance that no one would be caught."
On December 23, 1999, appellee filed a memorandum in opposition to appellant's summary judgment motion and argued that genuine issues of material fact remained for resolution at trial. Appellee claimed that during the normal operation of the machine, an employee would work within inches of the machine's rollers.[2] Appellee further argued that appellant: (1) knew a guard on the calendar was missing; (2) knew of prior incidents caused by the lack of machine guarding; (3) knew that the floor around the calendar machine was slippery; (4) knew that it did not have a machine specific lockout procedure; and (5) knew that it lacked proper safety training.
After reviewing the evidentiary materials, the trial court denied appellant's motion for summary judgment. The case proceeded to a jury trial and the voluminous evidence adduced at trial reveals the following facts.
In March of 1997, appellant, in pursuit of an expansion, acquired the calendar from its previous owner, RJF International. Appellant uses the calendar machine to produce a rubberized magnetic sheet that appellant then sends to other manufacturers to use to create flexible magnets.
When the calendar first was installed at appellant's plant, a piece of plexiglass covered part of the back side of the calendar machine. At some point prior to appellee's injury, the plexiglass was removed.[3]
The calendar machine has four rolls that are constructed of heavy steel. Each of the four rolls is thirty-six inches long and sixteen inches in diameter. Two of the rolls are located next to each other at the top of the machine. The roll in the front is called the "front" or "drive" roll and the roll in the back is called the "offset roll." Located underneath the front roll is the "middle roll," and underneath the middle roll another roll is located ("the bottom roll"). The front roll and the offset roll are usually heated between 290 and 300 degrees. Both the middle roll and the bottom roll are cooling drums. Four air nozzles are located on the machine that help cool the drums.
The point between the middle roll and the front roll is an "inrunning nip point." An inrunning nip point occurs when two rolls run in the same direction. An inrunning nip point poses a danger to a worker who comes into contact with the nip point.
When the calendar was first installed at Flexmag, a plexiglass guard or shield[4] covered the back side of the calendar machine and, consequently, covered the inrunning nip point. Evidence exists that the plexiglass served a dual purpose. The first was to keep crumbs from hitting the sheet as it was being produced. The second was to keep employees "out of the general area."
Ordinarily, the plexiglass remained in place. During the start up of the machine, however, a worker needed to remove the plexiglass. The plexiglass ordinarily did not need to be removed for any other purpose "unless the operator needed to get back in there for some reason. * * * [T]he operator may have a problem and he may go back there and have to take the shield off to adjust or do anything necessary back in there. A lot of times there'd be some grease back there and you'd have to remove it from the area." If an employee needed to remove grease from the back of the machine and the plexiglass, the machine would not be "locked out."[5]
About a week or two prior to the accident, appellee informed Paul Chalfant, appellee's immediate supervisor, that the plexiglass was missing and that it needed to be replaced. Chalfant stated that he would "look into it." Unfortunately, the plexiglass was not replaced prior to appellee's injury.
The operation of the calendar requires two employees. One employee works on the front and one works on the back. The employee who works the back granulates material into "compound," places the compound into a bin, and rolls the bin over to the calendar against the "stop bar." The "stop bar," which is located on the floor, prevents the bin from rolling into the back of the calendar. Once the bin is in place, the employee then shovels the compound into the calendar.[6]
When shoveling the compound into the calendar, pieces of the compound (or "crumbs," as Flexmag's employees refer to it) often fell to the floor. The floor at the back of the calendar became slippery from the crumbs and was a constant problem. Employees stated that the floor would become slippery no matter how careful a worker was.
In addition to the crumbs creating a slippery surface, grease and oil often dripped from the machine and accumulated on the floor around the calendar. The grease and oil contributed to the slippery condition of the floor.
Part of the employees' job was to sweep and clean the area around the calendar machine. Appellee stated, however, that "you couldn't keep [the calendar machine] clean. It leaked oil everywhere." Appellee also stated that employees tried to sweep up the crumbs, "but it was almost impossible to keep it swept up all the time."
One employee stated that he thought that the combination of the oil, the grease, and the crumbs on the floor created a dangerous condition. Several employees stated that when working at the back of the calendar, the operator was required to get close to the rollers.[7] One employee stated that he was not uneasy about shoveling compound into the calendar.
At the time of appellee's injury, appellee was employed as a set-up supervisor. His duties required him to assist other employees with operating the machinery within appellant's facility. Appellee sometimes needed to help the other employees solve problems with the machine.
On June 19, 1997, Flexmag employee Mike Irvin advised appellee that he was having "crumb problems" with the calendar machine. The crumbs originated from the opening located at the top of the machine where the employee shoveled the compound into the calendar. As the employee shoveled the compound, crumbs often fell and landed on the rollers of the machine. When the calendar machine was having "crumb problems," the rubberized sheet would become blemished. A blemished sheet would not meet production standards and, thus, the employee would need to recycle the blemished sheet through the manufacturing process.
To alleviate the crumb problem that caused the blemishes, employees used air hoses located on and near the calendar. The normal procedure was for the employee to hold the air hose and to blow the crumbs off of the rubberized sheet.
While using the air hose to blow the crumbs off of the product or when adjusting the air hoses, appellant's employees did not lock out the machine when removing the plexiglass. Appellee and other Flexmag employees stated that locking out the machine when adjusting the air hoses was not a necessary procedure. Appellee's expert witness stated, however, that Flexmag employees should have locked out the calendar machine before using the air hoses.
On June 19, 1997 at approximately 4:00 p.m., appellee and his supervisor, Paul Chalfant, decided to try a new method to fix the crumb problem. Appellee and Chalfant decided to tape air hoses to the bottom roll of the back side of the calendar machine in order to eliminate the need for an employee to physically stand by the machine and blow the crumbs off of the product. Appellee and Chalfant decided to tape the air hoses to the machine because if they "wanted to get any production out that day, something was going to have to be done."[8] Appellee and Chalfant decided to duct tape the air hose to a rod that was located close to one of the four rolls.[9] Appellee "didn't figure [he would] have to touch it again." Appellee and Chalfant completed the task without incident and successfully eliminated the crumb problem.
Later the same day, around 7:00 p.m., appellee returned to the calendar in order to relieve Flexmag employee Daniel R. Lang. When appellee arrived, Ivan Smitley, who also worked on the calendar, informed appellee that the product had started to become blemished. Appellee discovered that the vibration of the machine had caused the air hose to move from its original position.
Appellee decided to re-position the air hose so that it would continue to blow the crumbs off of the product. To reach the air hose, appellee moved the bin that contained the compound out of the way, crouched down, and placed one foot in front of the stop bar.[10] After appellee had re-positioned the air hose, appellee either tripped or slipped and reached forward to catch himself from falling. As appellee reached forward, his hand became entangled in the calendar machine.
During the trial, appellee presented evidence regarding appellant's knowledge of the dangerous condition of the nip point. Appellee's expert witness, Gerald C. Rennell, an expert in machine guarding and safety, stated that the unguarded inrunning nip point created a hazard. Additionally, appellee testified that he informed Flexmag management about the absence of the plexiglass. Moreover, evidence exists that Flexmag management knew that unguarded inrunning nip points were dangerous.
Chalfant stated, however, that although he and Flexmag management knew unguarded inrunning nip points are dangerous, when he and appellee installed the air hose he did not reach up behind the bar, closer to the nip point, and did not see appellee do so either. Chalfant claimed that his and appellee's activities were concentrated around the bar:
"[T]he nozzle actually was put in the hose. It's not like the hose went up in and then you had to go up in and plug your nozzle in. This was assembled sort of like you work backwards. So from anchoring the hose to the side of the machine would have been as close as we should have been to the nip."
Peggy E. Ross, who performed safety "walk-throughs" at appellant's plant and reviewed appellant's safety policies and programs, issued at least two reports noting that "machine guarding issues" throughout appellant's plant existed. During her first visit to Flexmag in September of 1996, she noted that "machine guarding issues" existed. Another report indicated that "Flexmag is experiencing many challenges in the safety arena attributed to the new equipment, new processes, new employees, limited space and new construction." A June 18, 1997 inspection revealed that "[g]uardings issues for in-running nips and pinch points remain an issue." During her June 18, 1997 inspection, however, Ross did not look at the calendar. Hendershot explained that the "machine guarding issues" language in Ross's reports referred to the stamping presses or to the punch presses, not to the calendar machine.
Flexmag's general manager, Thomas Dziedzic, stated that at the time of appellee's accident, the machine guarding problems with the inrunning nips points had not been solved. He admitted that after appellee's accident, a review revealed seventy-seven unguarded nip and pinch points throughout the plant. He stated that at least every machine had at least one unguarded nip or pinch point.
Rennell also stated that his investigation led him to believe that management knew of the lack of a guard over the nip point, the slippery condition of the floor that surrounded the calendar machine, and that employees worked close to the back side of the machine. He stated that Flexmag management knew that a guard was missing and recognized the danger of having an unguarded nip point. Rennell opined that "had [appellant] done a job safety analysis of this machine, that would have made this danger even more apparent to them."[11]
Dziedzic stated that he did not believe, however, that the calendar posed a danger of getting caught in the precise point that caused appellee's injury because that "inrunning nip is so inaccessible, and I really think that, if you put yourself past those cables, you're putting yourself in harm's way."[12] He stated that before appellee's accident, he had no knowledge that anyone had done anything similar.
Hendershot testified that not every nip point poses danger. Instead, he explained, the danger posed depends on the point of operation. Hendershot did not believe that the nip point where appellee was injured posed a problem because he "just didn't think of anybody even being up in there." Hendershot stated: "I mean, like I said, the point of operation from that machine was on the far side where you would wind the stock up, and on the back side the only point of operation was where the individual was shoveling the material onto the rolls."
Moreover, evidence exists that to reach the nip point where appellee was injured, an employee would have to move the bin that contained the compound. Flexmag employee Dan Lang stated that during the normal operation of the machine, the only reason to move the bin would be to refill the bin with compound. Appellant also presented evidence that the calendar machine complied with OSHA standards and, thus, it could not have known that the calendar machine posed a danger. The evidence further revealed that the calendar is equipped with a safety chain or rope that allows an employee to shut down the machine in emergency situations. Flexmag employee T.J. Gray stated, however, that it was possible to place additional guards on the back side of the calendar. Additionally, Flexmag employee Sanchez stated if the calendar had more guarding, appellee's injury would not have occurred. Sanchez further stated that the calendar machine violated Flexmag's company policy to have a physical guard over inrunning nip points.
Rennell also stated that Flexmag failed to properly guard the inrunning nip point. He testified: "You can't not put a guard on the machine and then let people go in there to to make adjustments." Rennell stated that if it were his choice, he would have put a guard over the nip point.
Appellee's counsel questioned Rennell as to "what possible measures could and should have been taken to provide mechanical and physical safeguards" on the calendar "to the maximum extent possible." Rennell stated that the area where appellee was injured is easy to guard. Rennell stated that appellant could have used a light curtain (a beam of light that will shut down the machine if an employee's hand crosses the "curtain").
Flexmag management claimed, however, that the safety mechanisms used on the calendar machine complied with OSHA. Dziedzic stated that when the calendar was first installed, he reviewed the OSHA regulations and concluded that the calendar complied with the regulations. Lloyd Thornburg, appellant's safety consultant, likewise concluded that the calendar machine complied with OSHA. Additionally, one of appellant's expert witnesses, William J. Winter, who has designed calendar machines since 1969, testified that appellant's calendar machine complied with OSHA and that no industry standard requires a regular calendar machine to be guarded, beyond having a safety cable.
Richard H. Hayes, another expert witness who testified for appellant, stated that the calendar machine complied with OSHA and that OSHA does not require a guard to cover the inrunning nip point where appellee was injured. Hayes admitted, however, that further guards could have been placed on the machine.
Both appellant and appellee presented testimony from witnesses who stated their opinions as to the substantial certainty of injury. Miller stated that he did not believe that an employee would become entangled in the nip point that appellee did. Miller stated that he did not feel that when he worked on the machine while it was located at RJF International that he was "substantially likely to get caught in the nip point." Miller explained that he usually did not have a reason to be in the area where appellee was injured. Miller further noted that he had worked on the machine for four to six years without the plexiglass in place.
Flexmag employee Rick Crum also stated that he did not believe an employee would become entangled in the nip point that caused appellee's injury. Crum stated that an employee "shouldn't even be" in the area appellee was when he was injured.
Flexmag employee Sanchez stated that he thought that the process of taking the air hose in his hand and blowing the crumbs off of the product was dangerous. He testified that he did not like getting that close to the rolls. Sanchez further opined that the combination of the lack of a guard over the nip point where appellee was injured, the slippery condition of the floor, and the requirement that employees get close to the rollers to blow off the crumbs created a substantial certainty of injury.
Rennell also opined that an injury to an employee was a substantial certainty. Rennell explained that an inrunning nip point is the most serious of hazards because it "tries to pull you in." Rennell stated: "[I]f we allow people to approach the hazard on a regular basis, an accident is substantially certain to occur."[13] Rennell determined that "it was foreseeable and predictable that somebody would in some way, shape or form, if allowed to work there, get into that hazard." Rennell continued:
"[I]t's a fact that, if you put [an employee] in that situation enough times, eventually something is going to happen. As I said, maybe it's a dizzy spell, maybe it's a slip on the floor, maybe it's a loud noise that distracts him. [If one is] in the danger area enough times, eventually you're going to get in contact with that hazard."
To further support his opinion that an injury was substantially certain to occur, Rennell referred to the National Safety Council Accident Prevention Manual for Industrial Operations, which states "something to the effect that if you put an employee next to an unguarded or partially guarded machine and rely on constant awareness and procedures by the operator to prevent an injury * * * an accident is virtually certain to occur."
Rennell further claimed that appellee's injury itself demonstrated the substantial certainty of the injury. Rennell noted that when appellee was injured, it was only the second time that an employee went into that particular area to perform the specific task that appellee performed and an injury occurred.
Supervisor Chalfant stated, however, that he did not believe that the nip point where appellee was injured was a danger because:
"[I]f you'd look to where the nozzle would actually be, I think we're probably talking between what twelve and sixteen inches from the nip point. To me, I mean, that's far enough away from any kind of nip point to do what we were doing."
Dziedzic stated that he did not believe that a substantial certainty existed that someone would get caught in the nip point where appellee did. He explained that from what he observed, he "just couldn't imagine anybody putting themselves in the position they did." Dziedzic testified that prior to the date of appellee's injury, no employee had ever crouched in that particular area by that particular nip point. Dziedzic further stated that during the normal operation of the machine, the employees would not come in close contact with the nip point where appellee was injured.
Appellee also presented evidence that prior accidents had occurred on the calendar machine. Appellee claimed that the prior accidents helped to demonstrate appellant's knowledge that injury to appellee was a substantial certainty. Evidence of the prior accidents revealed that when the machine was operated at BF Goodrich, the predecessor to RJF International, an employee's hand was caught on the front side of the machine between the two cooling drums. While the machine was located at appellant's facility, Flexmag employee Lang caught his fingers in a roller on the front side of the calendar machine. The record contains no evidence, however, of prior accidents that occurred in the same nip point where appellee was injured.
Appellee also presented evidence and argued that appellant failed to institute appropriate safety procedures, policies, and training. The lack of training, appellee asserts, contributes to a finding that injury to an employee was a substantial certainty. The evidence reveals that at the time of appellee's accident, appellant did not have a safety committee. Moreover, conflicting testimony exists as to whether appellant's employees received adequate training on the use of the calendar machine. Rennell also stated that Flexmag did not adequately train its employees regarding lockout procedures. Rennell testified that Flexmag "should have" advised its employees to stay away from the area where appellee was injured while the machine was running. Rennell also stated his belief that appellant was not conducting regular safety inspections and criticized appellant's failure to do so. Rennell stated that regular safety inspections in a plant like Flexmag are "critical because hazards come and go."
Rennell also denounced appellant's failure to have "a machine specific lockout procedure" on the calendar. Rennell stated that appellant should have told employees to lockout the machine "under all conditions." Rennell stated: "[T]here's no way you can let that guy go back up under there with the machine running at production speed." Rennell explained that:
"[If an employee is] going to go in there to make adjustments of something, you either have to shut the machine down now, that might have been inconvenient, so they should have said, `Well, then let's put a guard up.' And then we can put a guard up so you can still spray the nozzle back there, but the guard will protect you from the inrunning nip point and then you don't need a lockout/tagout."
Dziedzic stated that a calendar specific lockout procedure would not have prevented accident "[b]ecause what [appellee and Chalfant] were attempting to do was to put air on the back of the machine while it was running to assess it having an impact on the quality of the product coming out the front. So, therefore, for them to successfully do that, it would have to be running."
Chalfant also stated that locking out the calendar would not have prevented the accident. Chalfant explained: "You have to have it running to see whether you're accomplishing what you're doing or wanting to do with the air. If you shut the calendar off and put an air hose on it while it's down, it's not going to tell you anything." Chalfant admitted, however, that he could have kept locking out the machine and re-starting it until he and appellee found the right position for the air hose.
Thornburg stated that he trained Flexmag's employees on lockout procedures. Thornburg testified that a machine specific lockout procedure for the calendar would not describe when one should lockout the machine and would not have covered the activity that appellee was engaged in when he was injured. Thornburg further stated that "it's not humanly possible to to try to figure out every situation that you would have to lock it out" and that he has never seen a machine specific lockout/tagout procedure.
Appellee presented evidence that OSHA cited appellant for the incident that caused appellee's injury. OSHA initially cited appellant for failing to lockout the calendar machine. The parties reached a settlement agreement that changed the citation to note that appellant failed to guard its machines.
OSHA cited appellant for violating 29 C.F.R. § 1910.147(c)(1). The citation notes:
 "The employer did not establish a program consisting of an energy control procedure and employee training to ensure that before any employee performed any servicing or maintenance on a machine or equipment where the unexpected energizing, start up or release of stored energy could occur and cause injury, or when an employee is required to place his or her body in a danger zone during a machine operating cycle, the machine or equipment would be isolated, and rendered inoperative in accordance with 29 C.F.R. § 1910.147(c)(4).
The employer had not established an energy isolation program that required energy isolation when an employee was required to place any part of his or her body into an area on a machine or piece of equipment where a danger zone exists during a machine operating cycle, i.e., an employee was caught in the inrunning nip points at the rear of the Adams United Magnetic, Inverted L, 4 roll Calendar in the sheet production area while making adjustments to an air hose resulting in the amputation of four fingers on the right hand."
Appellant and OSHA subsequently entered into an informal settlement agreement. The settlement agreement amended the above citation to provide as follows:
 "On or about June 19, 1997 an employee was caught in the inrunning nip points at the rear of the [calendar] in the sheet production area while making adjustments to an air hose resulting in the amputation of four fingers on the right hand."
During trial, appellee argued that the following factors demonstrate that appellant committed an intentional tort: (1) appellant knew that several unguarded nip points existed throughout the plant; (2) appellant knew that unguarded nip points were dangerous; (3) appellant knew that the area around the machine was dirty and that the floor was slippery, (3) appellant knew that a plexiglass that covered the inrunning nip point had been removed from the machine, (4) appellant knew that employees were not "locking out" the machine when using the air hoses, (5) appellant knew that its policy was to keep the calendar machine running, (6) appellant knew that its employees were working under pressure due to the expansion;[14] and (7) appellant knew that it did not have a sufficient training program for the calendar machine.
The jury, after deliberating for approximately six hours, returned a verdict in appellee's favor. The jury awarded compensatory damages of $3,867,000 to appellee, $112,000 to appellee's wife for loss of consortium, and $2 million in punitive damages. The jury also determined that appellee was entitled to attorney fees.
On April 20, 2000, appellant filed a motion for new trial and/or remittitur and/or judgment notwithstanding the verdict. With respect to its motion for judgment notwithstanding the verdict, appellant claimed that the record contains no evidence that it committed an intentional tort. Regarding its motion to strike the punitive damages award, appellant asserted that the record contains no evidence that it acted with actual malice or conscious disregard. Appellant requested a new trial due to the trial court's error in allowing evidence regarding the OSHA settlement and citation, the prior accidents, and the general conditions in the plant that were not specific to the calendar machine.
Appellee, on the other hand, argued as follows:
 "While Plaintiffs probably did not need to prove anything other than the fact that Flexmag failed to replace the Plexiglas shield, at Jeff Brookover's request, Plaintiffs introduced substantial additional evidence showing Flexmag's wholesale inattention to safety, leading to this tragedy."
On August 8, 2000, the trial court awarded appellees attorney fees.
On October 18, 2000, the trial court summarily overruled all four of appellant's motions. On November 15, 2000, appellant filed a notice of appeal, and on November 22, 2000, appellees filed notice of cross appeal.
 I
In its first assignment of error, appellant asserts that the trial court erred by: (1) denying its motion for a directed verdict regarding appellee's punitive damages claim and (2) denying its motion for a judgment notwithstanding the verdict ("JNOV") regarding the intentional tort claim. We first consider whether the trial court erred by denying appellee's JNOV motion regarding the intentional tort claim.
 A JNOV and DIRECTED VERDICT STANDARD
The same standard applies to both motions for directed verdict and motions for judgment notwithstanding the verdict. See Pariseau v. WedgeProducts, Inc. (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511, 514-515;Posin v. A.B.C. Motor Court Hotel (1976), 45 Ohio St.2d 271, 275,344 N.E.2d 334, 338; Tulloh v. Goodyear Atomic Corp. (1994),93 Ohio App.3d 740, 746-47, 639 N.E.2d 1203, 1207; Feldon v. AshlandChem. Co., Inc. (1993), 91 Ohio App.3d 48, 55, 631 N.E.2d 689, 693. "[A] motion for a directed verdict [or JNOV] must be denied when `substantial, competent evidence has been presented from which reasonable minds could draw different conclusions.'" Kroh v. Continental Gen. Tire,Inc. (2001), 92 Ohio St.3d 30, 31, 748 N.E.2d 36, 37. A court shall not grant a directed verdict or JNOV when the record contains sufficient evidence going to all the essential elements of the nonmoving party's case. See, e.g., Texler v. D.O. Summers Cleaners (1998), 81 Ohio St.3d 677,679, 693 N.E.2d 217, 273; Wells v. Miami Valley Hosp. (1993),90 Ohio App.3d 840, 631 N.E.2d 642. A motion for directed verdict or JNOV presents a question of law. Wagner v. Midwestern Indem. Co. (1998),83 Ohio St.3d 287, 294, 699 N.E.2d 507, 513; Wagner v. RocheLaboratories (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252, 255; Rutav. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68-69, 430 N.E.2d 935,938.
"In determining whether to direct a verdict, the trial court does not engage in a weighing of the evidence, nor does it evaluate the credibility of witnesses. Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, 67-68, 430 N.E.2d 935, 937. Rather, the court is confronted solely with a question of law: Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury? Id. at 68-69, 23 O.O.3d at 116, 430 N.E.2d at 938." Malonev. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 445,659 N.E.2d 1242, 1247.
In construing the evidence most strongly in favor of the nonmoving party, the court must give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence. Broz v.Winland (1994), 68 Ohio St.3d 521, 526, 629 N.E.2d 395, 399; Blair v.Goff-Kirby Co. (1976), 49 Ohio St.2d 5, 10, 358 N.E.2d 634, 637. When considering a motion for directed verdict or JNOV, the court must determine not whether one version of the facts presented is more persuasive than another. Strother v. Hutchinson (1981), 67 Ohio St.2d 282,284, 423 N.E.2d 467, 469-470. Rather, the court must determine whether the trier of fact could reach only one result under the theories of law presented in the complaint. Id. When the record contains substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the trial court must deny the motion.Ramage v. Cent. Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97,109, 592 N.E.2d 828, 837.
Thus, a trial court may not enter a directed verdict or a JNOV against an employee in an intentional tort action when sufficient evidence exists that: (1) the employer has knowledge of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) the employer has knowledge that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. See, e.g., Fyffe v. Jeno's,Inc. (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus. A trial court may enter a directed verdict or JNOV in an employer's favor when an employee fails to present sufficient evidence establishing any one of the above three prongs.
 B INTENTIONAL TORT
Although the workers' compensation provisions provide employees with the primary means of compensation for injury suffered in the scope of employment, an employee may institute a tort action against the employer when the employer's conduct is sufficiently "egregious" to constitute an intentional tort. See Sanek v. Duracote Corp. (1989), 43 Ohio St.3d 169,172, 539 N.E.2d 1114, 1117; see, also, Hannah v. Dayton Power LightCo. (1998), 82 Ohio St.3d 482, 484, 696 N.E.2d 1044, 1045; Van Fossen v.Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 115, 522 N.E.2d 489, 503
(stating that the ultimate question in an intentional tort case is "`what level of risk-exposure is so egregious as to constitute an "intentional wrong"'") (quoting Millison v. E.I. du Pont de Nemours Co. (1985),101 N.J. 161, 177, 501 A.2d 505, 514)); Blankenship v. CincinnatiMilacron Chemicals, Inc. (1982), 69 Ohio St.2d 608, 433 N.E.2d 572;Blanton v. International Minerals Chemical Corp. (1997),125 Ohio App.3d 22, 25, 707 N.E.2d 960, 962. When an employer's conduct is sufficiently egregious to constitute an intentional tort, it is said that the employer's act occurs outside the scope of employment, and, thus, recovery is not limited to the workers' compensation provisions. See Blankenship, 69 Ohio St.2d at 613 n. 7, 433 N.E.2d at 576.
"[A]n intentional tort is `an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur.'" Hannah, 82 Ohio St.3d at 484, 696 N.E.2d at 1046
(quoting Jones v. VIP Dev. Co. (1984), 15 Ohio St.3d 90, 472 N.E.2d 1046, paragraph one of the syllabus). As noted above, a successful employer intentional tort action requires the employee to establish three basic elements:
"`(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.'" Hannah, 82 Ohio St.3d at 484, 696 N.E.2d at 1046
(quoting Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus).
In determining whether an employer's conduct is sufficiently egregious to constitute an intentional tort, courts must refrain from construing "intentional tort" too broadly. As the court stated in Van Fossen,36 Ohio St.3d at 116, 522 N.E.2d at 504:
"`[T]he dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the [Workers' Compensation] Act is not circumvented simply because a known risk later blossoms into reality. * * *'" Id. (quoting Millison v. E.I. du Pont de Nemours Co. (1985), 101 N.J. 161, 178, 501 A.2d 505, 514) (citation omitted).
The court continued to explain that "intentional wrong" (or tort) should be construed narrowly so as not to subvert the purposes of the Workers' Compensation Act:
"`[I]f "intentional wrong" is interpreted too broadly, this single exception would swallow up the entire "exclusivity" provision of the Act, since virtually all employee accidents, injuries, and sicknesses are a result of the employer or a co-employee intentionally acting to do whatever it is that may or may not lead to eventual injury or disease. Thus in setting an appropriate standard by which to measure an "intentional wrong," we are careful to keep an eye fixed on the obvious: the system of workers' compensation confronts head-on the unpleasant, even harsh, reality — but a reality nevertheless — that industry knowingly exposes workers to the risks of injury and disease.'"Van Fossen, 36 Ohio St.3d at 115-16, 522 N.E.2d at 503 (quoting Millisonv. E.I. du Pont de Nemours Co. (1985), 101 N.J. 161, 177, 501 A.2d 505,513).
In seeking to define "intentional tort," Van Fossen also recognized that although many employment situations involve obvious dangers incident to employment, not all such obvious risks will satisfy the intentional tort standard. The court stated:
 "[I]n determining the level of `"risk exposure" that will satisfy the "intentional wrong" exception * * * [c]ourts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitled the employee to recover only under the Compensation Act?'" Van Fossen, 36 Ohio St.3d at 116, 522 N.E.2d at 503-504 (quoting Millison v. E.I. du Pont de Nemours Co. (1985), 101 N.J. 161, 178-79, 501 A.2d 505, 514).
In the case at bar, we agree with the trial court's decision to deny appellant's alternative motions for a judgment notwithstanding the verdict and for a directed verdict. We believe that the trial court correctly concluded that the record contains sufficient evidence going to all the essential elements of appellee's intentional tort claim.
 1 KNOWLEDGE OF A DANGEROUS PROCEDURE
Appellant first argues that appellee failed to demonstrate that it possessed actual knowledge of the exact danger that ultimately caused appellee's injury. Appellant asserts that the evidence fails to reveal that it had actual knowledge that the particular nip point where appellee was injured was dangerous. Appellant claims that it did not have actual knowledge of the exact danger that caused appellee's injury because: (1) it "reasonably believed that the machine complied with applicable OSHA and ANSI standards"; (2) "no one ever complained that the calendar was dangerous"; (3) no evidence exists of a prior accident occurring at the rear of the particular calendar machine; and (4) the nip point where appellee was injured was in an "inaccessible location." Appellant contends that the combination of the above circumstances "made it highly unlikely that anyone would approach" the nip point where appellee was injured.
Appellant further claims that because neither Chalfant nor appellee believed that the process of taping the air hoses to the back of the calendar and adjusting the air hose was dangerous, it likewise did not know that the procedure was dangerous. Appellant also argues: (1) that it did not have actual knowledge that operating the calendar without the plexiglass was dangerous and that the plexiglass was not "intended" to serve as a safety guard; (2) that it did not have actual knowledge of the slippery condition of the floor and that appellant "instructed its employees to keep floors in the plant clean." Appellant thus asserts that it "did not have actual knowledge of a `dangerous condition' because it could assume that its employees were following instructions."
Appellee argues that it presented overwhelming evidence regarding appellant's knowledge. Appellee claims that the evidence reveals that: (1) appellant knew the plexiglass was missing; (2) the plexiglass would have prevented the accident; (3) that the plexiglass served as a safety device by covering the nip point; and (4) appellant knew that unguarded nip points are dangerous. Appellee further argues that the record contains "substantial evidence that [appellant] knew of the chronic `dangerous condition' of unguarded machinery throughout its plant. For many years, all of the plant inspections at Flexmag identified ongoing problems with unguarded machinery."
Appellee additionally asserts that appellant was aware (1) of the slippery condition of the floor that the rubber compound, oil, and grease created; (2) that its employees were not locking out the calendar when adjusting air nozzles; and (3) that it was not adequately training its employees on the use of the calendar.
The first element of Fyffe requires the employee to establish that the employer possessed knowledge of a dangerous process, procedure, instrumentality, or condition within its business operations. In order to satisfy the first prong, the employee must demonstrate that: (1) a dangerous condition existed within the employer's business operations; and (2) that the employer had knowledge that the dangerous condition existed. See Dailey v. Eaton Corp. (2000) 138 Ohio App.3d 575, 581-82,741 N.E.2d 946, 951.
"In determining whether the condition or procedure was indeed dangerous * * * `dangerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach.'" Dailey v.Eaton Corp. (2000), 138 Ohio App.3d 575, 582, 741 N.E.2d 946, 951
(quoting Naragon v. Dayton Power Light Co. (March 30, 1998), Shelby App. No. 17-97-21, unreported).
Moreover, "the `dangerous condition' at issue must be one which falls outside the `natural hazards of employment,' which one assumes have been taken into consideration by employers when promulgating safety regulations and procedures." Youngbird v. Whirlpool Corp. (1994),99 Ohio App.3d 740, 747, 651 N.E.2d 1314, 1318 (citing Brady v.Safety-Kleen Corp. (1991), 61 Ohio St.3d 624, 631, 576 N.E.2d 722, 727
and Blankenship v. Cincinnati Milacron Chemicals, Inc., supra).
To decide whether the employer had knowledge that such a condition or procedure was dangerous, a court must examine whether the employer actually knew of the dangerous condition. See Dailey,138 Ohio App.3d at 582, 741 N.E.2d at 951 (citing Fultz v. Baja Boats, Inc. (Feb. 18, 1994), Crawford App. No. 3-93-10, unreported). The Dailey court cautioned:
"[T]his is not the `reasonable person' standard for determining negligence or recklessness; that is, the fact that the employer should have known it was requiring the employee to work under such dangerous conditions that he would certainly be injured is not enough to establish a case in intentional tort. Rather, the determination rests upon a claimant's alleging facts which show the employer's actual knowledge of the situation." Dailey, 138 Ohio App.3d at 582, 741 N.E.2d at 951.
In the case at bar, we agree with appellee that sufficient facts exists in the record to illustrate that appellant possessed actual knowledge of a dangerous condition. Appellant claims that it lacked knowledge that employees adjusted the air hoses on the back of the calendar machine in the manner that appellee adjusted the hoses at the time of his injury. Appellant argues that prior to the date of appellee's accident, it knew of no other employee who had engaged in this specific task. The record reveals, however, that prior to (and on the date of) appellee's injury, appellee's supervisor had engaged in the same procedure that resulted in appellee's injury. To tape the air hoses on the back of the machine required appellee and his supervisor to work around the unguarded, inrunning nip point.[15] Moreover, evidence exists that appellant knew that coming in close contact with unguarded, inrunning nip points was dangerous. Thus, because appellant's supervisor knew, prior to appellee's injury, that appellee had been working near the unguarded, inrunning nip point, appellant therefore knew of a dangerous process or procedure within its business operations.
Additionally, the record reveals that appellant knew of the extremely slippery condition of the floor. Thus, in light of the fact that appellant knew that employees worked on a slippery floor surface near an unguarded, inrunning nip point, a reasonable jury could conclude that appellant had knowledge of a dangerous condition, beyond the natural hazards associated with appellee's employment, within its business operations.
Although appellant claims that the employees were obligated to sweep the crumbs and to keep the machine area clean, the record contains ample evidence to establish that the slippery condition of the floor was a chronic, uncontrollable problem.
Consequently, we disagree with appellant that no evidence exists that it possessed knowledge of a dangerous condition within its business operations.
 2 SUBSTANTIAL CERTAINTY
Appellant also argues that appellee failed to establish that appellant possessed knowledge that harm to an employee would be a substantial certainty.
Under the second prong of Fyffe, if the employer knows that the dangerous procedure is substantially certain to cause harm to the employee, intent is inferred.[16] See Harasyn v. Normandy Metals, Inc. (1990), 49 Ohio St.3d 173, 175, 551 N.E.2d 962, 964 (stating that when the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result, then intent will be inferred); see, also, Ailiff v. Mar-Bal,Inc. (1990), 62 Ohio App.3d 232, 238, 575 N.E.2d 228, 232, motion to certify overruled, 56 Ohio St.3d 704, 564 N.E.2d 707.
"The `intent' which must be shown `"is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way the law forbids."' Jones v. VIP Development Co., 15 Ohio St.3d at 94,472 N.E.2d at 1051 (quoting Prosser Keeton, Law of Torts [5 Ed. 1984] 36, Section 8). Intent, in the context of intentional tort, `"extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does."'Id. at 94-95, 472 N.E.2d at 1051." Youngbird v. Whirlpool Corp. (1994),99 Ohio App.3d 740, 746, 651 N.E.2d 1314, 1318, appeal dismissed as improvidently allowed, (1995), 72 Ohio St.3d 1213, 649 N.E.2d 832.
Thus, the employee need not illustrate that the employer subjectively intended "to accomplish the consequences." Van Fossen,36 Ohio St.3d at 117, 522 N.E.2d at 504.
An employee cannot, however, establish the "substantial certainty" element simply by demonstrating that the employer acted negligently or recklessly. Hannah, 82 Ohio St.3d at 484, 696 N.E.2d at 1046; VanFossen, paragraph six of the syllabus. Rather, the employee must show that the employer's conduct was more than mere negligence or recklessness. In Fyffe, the court explained:
 "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as reckless. As the probability that the consequences will follow further increase, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Fyffe, paragraph two of the syllabus.[17]
The Fyffe court continued:
 "* * * [A]cts of the employer that are termed a `high risk' of harm, or `where the risk is great,' could, in most instances, correctly be viewed as acts of recklessness. However, in a given instance, and within a certain fact pattern, such acts could equate to one that is substantially certain to result in harm to the employee, and reasonably raise a justiciable issue of an intentional tort." Fyffe, 59 Ohio St.3d at 117, 570 N.E.2d at 1111-12.
The Fyffe court further recognized that "some industrial activities that involve a high risk of harm, or where the risk of harm is great, may reasonably encompass situations that fall within the scope of an `intentional tort.'" Fyffe, 59 Ohio St.3d at 117, 570 N.E.2d at 1111.
As several courts have noted, establishing that the employer's conduct was more than negligence or recklessness "is a difficult standard to meet." McGee v. Goodyear Atomic Corp. (1995), 103 Ohio App.3d 236, 246,659 N.E.2d 317, 324.
"The standard has been described as `harsh,' [Goodwin v. KarlshamnsUSA, Inc. (1993), 85 Ohio App.3d 240, 247, 619 N.E.2d 508], and one court has noted that the Supreme Court of Ohio has defined the breadth of employer intentional torts very narrowly out of a concern `that an expansive interpretation could thwart the legislative bargain underlying workers' compensation by eroding the exclusivity of both the liability and the recovery provided by workers' compensation.' Kincer v. AmericanBrick Block, Inc. (Jan. 24, 1997), Montgomery App. No. 16073, unreported (quoting Spates v. Jones (July 12, 1995), Montgomery App. No. 15057, unreported)." Taulbee, 120 Ohio App.3d at 18,696 N.E.2d at 629-30.
Proof that the employer knew to a substantial certainty that harm to the employee would result often must be demonstrated through circumstantial evidence and inferences drawn from the evidence. SeeHannah, 82 Ohio St.3d at 485, 696 N.E.2d at 1046; Emminger v. MotionSavers, Inc. (1990), 60 Ohio App.3d 14, 17, 572 N.E.2d 257, 260. TheEmminger court explained:
 "Proof of the employer's intent * * * is by necessity a matter of circumstantial evidence and inferences drawn from alleged facts appearing in the depositions, affidavits and exhibits. Even with these facts construed most strongly in favor of the employee * * * the proof of the employer's intent must still be more than negligence or recklessness." Id.
In establishing whether an employer knows that an injury is substantially certain to occur, prior accidents are probative. Taulbee,120 Ohio App.3d at 20, 696 N.E.2d at 631. Moreover, "the absence of prior accidents `strongly suggests' that injury from the procedure was not substantially certain to result from the manner in which the job was performed." Taulbee, 120 Ohio App.3d at 20, 696 N.E.2d at 631.
A lack of prior accidents, however, "is not necessarily fatal to a plaintiff's case." Id. As the Taulbee court stated:
 "`* * * Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. [To accept this reasoning] would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of Fyffe." Id., 120 Ohio App.3d at 20, 696 N.E.2d at 631 (quoting Cook v. Cleveland Elec. Illum. Co. (1995), 102 Ohio App.3d 417, 429-30, 657 N.E.2d 356).
Thus, "`in the final analysis, absent some other evidence indicating that injury is substantially certain to occur, such as a number of prior accidents resulting from the dangerous condition, a determination of substantial certainty turns in large part on the nature of the dangerous condition.'" Taulbee, 120 Ohio App.3d at 21, 696 N.E.2d at 631 (quotingPalk v. S.E. Johnson Companies (Nov. 9, 1993), Franklin App. No. 93AP-573, unreported). See, generally, Busch v. Unibuilt Indus., Inc. (Sept. 22, 2000), Montgomery App. No. 18175, unreported (concluding that requiring employees to work eight feet above a floor without any restraints or other safety devices is an obvious danger that is substantially certain to result in injury). Accordingly, in reviewing whether the employer knew that harm to the employee was a substantial certainty, courts should focus not only on the existence of prior similar incidents, but also "on the employer's knowledge of the degree of risk involved." Taulbee, 120 Ohio App.3d at 21, 696 N.E.2d at 631.
As noted above, however, mere knowledge and appreciation of a risk does not establish "intent" on the part of the employer. Cross v. HydracretePumping Co., Inc. (1999), 133 Ohio App.3d 501, 507, 728 N.E.2d 1104. Furthermore, in demonstrating that the employer knew that injury to the employee was a substantial certainty, "[w]hat a reasonable person should have known is not sufficient." Burkey v. Teledyne Farris Engineering
(June 30, 2000), Tuscarawas App. No. 1999AP030015, unreported, discretionary appeal not allowed, 90 Ohio St.3d 1450, 737 N.E.2d 53; see, also, Sanek v. Duracote (1989), 43 Ohio St.3d 169, 172,539 N.E.2d 1114, 1116-17. Rather, the employee must show that the employer possessed "actual knowledge" that injury to the employee was a substantial certainty.[18] Sanek, 43 Ohio St.3d at 172,539 N.E.2d at 1117. Moreover, "[u]ltimately, the question of an employer's intent is a question of fact." Russell v. Interim Personnel, Inc. (1999),135 Ohio App.3d 301, 307, 733 N.E.2d 1186, 1190; see, also, Dailey v.Eaton Corp. (200), 138 Ohio App.3d 575, 584-585, 741 N.E.2d 946, 953
("Whether or not [an] injury is known to be substantially certain to occur is an issue of fact.").
In the case sub judice, no evidence exists that previous to appellee's injury any employee had been injured in the same manner and in the same nip point as appellee.[19] Thus, in order to determine whether appellant knew that injury to appellee was a substantial certainty, we must examine the nature of the danger that caused appellee's injury.
The record contains ample evidence that appellant knew that unguarded, inrunning nip points would be substantially certain to cause an injury if an employee came in contact with the unguarded, inrunning nip point. The record also contains ample evidence of the extremely slippery floor around the machine. Because appellant knew that appellee, to adjust the air hose, would work near the unguarded, inrunning nip point while walking on a slippery floor, we agree with the trial court's conclusion that appellant possessed actual knowledge that an injury to appellee was a substantial certainty. Cf. Long v. International Wire Group, Inc. (Aug. 22, 2000), Crawford App. No. 3-2000-11, unreported (concluding that evidence of lack of a plexiglass guard, supervisor's knowledge of lack of guard, and obvious danger of unguarded machine supported inference that employer knew injury to employee was a substantial certainty); Whitlockv. Enterprise Metal Serv., Inc. (Nov. 4, 1994), Lucas App. No. L-94-115, unreported (finding that evidence that unguarded pinch point and slippery floor around the machine demonstrated that employer knew of substantial certainty of injury). Contra Church v. Rondy and Co., Inc. (June 11, 1997), Summit App. No. 18037, unreported (noted that no prior complaints regarding safety of machine that caused employee's injury). But, see,Kincer v. American Brick and Block, Inc. (Jan. 24, 1997), Miami App. No. 16073, unreported (concluded that evidence that employer knew unguarded conveyor belt was dangerous and knew that employee did not follow established lockout procedure may have been reckless, but was not substantially certain to cause an injury).
Moreover, in determining an employer's intent, the trier of fact may consider evidence that an employer has deliberately removed or deliberately failed to install a safety guard.[20] Fyffe, paragraph three of the syllabus; Walton v. Springwood Products, Inc. (1995),105 Ohio App.3d 400, 663 N.E.2d 1365.
In the case sub judice, evidence exists that appellant deliberately failed to replace a safety guard. The trier of fact appropriately considered appellant's failure to replace the safety guard when determining whether an injury to appellee was a substantial certainty.Fyffe.
Appellant nevertheless argues that because appellee had an alternative method of proceeding, appellant could not have known that injury to appellant was a substantial certainty. We agree in principle with appellant that when an employee has an alternative, safer method to proceed with a dangerous task, and the employee nonetheless opts to disregard the safer method, the employer might not be charged with knowing that injury to the employee was substantially certain. See Goodinv. Columbia Gas of Ohio, Inc. (2000), 141 Ohio App.3d 207, 750 N.E.2d 1122, appeal dismissed as improvidently allowed (2001), 92 Ohio St.3d 1214,749 N.E.2d 305, motion to reconsider denied (2001), 93 Ohio St.3d 1434,755 N.E.2d 356; McConville v. Jackson Comfort Sys., Inc. (1994),95 Ohio App.3d 297, 642 N.E.2d 416; Neal v. McGill Septic Tank Co. (Dec. 4, 1998), Trumbull App. No. 98-T-0022, unreported (stating that "an employer is not liable for the injuries the employee suffered on an intentional tort theory where the employee voluntarily deviates from his employer's instructions or established operating procedure"). However, in the case sub judice we disagree with appellant that appellee possessed an alternative, safer method to proceed with his job duties.
Although appellee failed to lockout the calendar prior to adjusting the air hose, the record is replete with testimony that employees were not required to lockout the calendar before adjusting the air hoses. Moreover, when appellee and his supervisor initially taped the air hoses, they did not lockout the calendar. Although appellee, in theory, possessed an alternative, safer method of proceeding, the record reveals that, in practice, employees were not taught to follow the safer lockout method. Rather, appellant's policy was to keep the calendar running. Contra Bare v. Warren Consolidated Indus. (Sept. 21, 2001), Trumbull App. No. 2000-T-0133, unreported (affirming summary judgment in intentional tort action when no evidence existed that employer "circumvent[ed] appropriate safety procedures or encouraged its employees to do so").
Appellant further claims that because appellee did not believe that it was dangerous to adjust the air hose without locking out the calendar, it likewise "could not have known that injury was a `substantial certainty.'" To support its argument, appellant cites D'Amico v. SevensonEnviron. Servs., Inc. (Sept. 30, 1994), Mahoning App. No. 93CA 150, unreported. In D'Amico, the court stated that in an intentional tort action, "if the [employee] did not, with substantial certainty, reason that he could suffer an injury then such knowledge cannot be imputed to the employer."
Appellee disagrees with appellant's argument. Appellee argues:
 "Flexmag misstates the `dangerous condition' that Brookover was subjected to as being the adjustment of the air hose. However, the adjustment of the air hose is not the `dangerous condition' that Plaintiffs alleged or proved in this case; the unguarded nip point was. The fact that Brookover was adjusting an air hose at the time was incidental to the fact that he was caught in the calendar machine's unguarded nip point. Brookover did not get caught in an air hose; he got caught in an unguarded nip point."
Moreover, appellee asserts, appellee appreciated the danger of the unguarded nip point. Appellee notes that the record contains evidence that he informed one of appellant's employees that the plexiglass needed to be in place.
While in theory we could apply D'Amico to the case at bar and thus determine that appellant lacked knowledge that injury to appellee would be a substantial certainty, we decline to do so. Instead, we believe that whether the employee thought he could perform the task without substantial certainty of injury should be one of the many factors that a court may consider when determining an employer's knowledge. As we noted above, in the instant case several factors support the jury's determination that appellant knew that injury to appellee was a substantial certainty.
Additionally, appellant argues that because appellee's supervisor engaged in the task with appellee, "it is highly unlikely" that appellant knew that injury to an employee would be a substantial certainty. Appellant asserts:
"A supervisor would not knowingly expose himself to a danger that he knew was `substantially certain' to cause himself personal injury. Thus, the fact that Chalfant installed the air hose with Brookover while the calendar was running negates any finding of `substantial certainty.'"
While appellant correctly notes that a few cases have held that the employer cannot have knowledge of injury to a substantial certainty when a supervisor places himself in the same position as the injured employee,[21] we disagree that this factor alone determines whether the employer knew that injury to the employee was a substantial certainty. Rather, it is, again, simply one factor that may be considered in the substantial certainty analysis.
Appellant argues that evidence of other unguarded nip points that existed throughout its plant does not establish that appellant knew that injury to appellee on the calendar machine in the particular nip point was a substantial certainty. Appellee contends that the evidence regarding the seventy-seven unguarded nip points throughout the plant helped to prove that injury to appellee was a substantial certainty. Appellee asserts:
"What could be more predictive of the `substantial certainty' of getting caught in an unguarded nip point than the fact that every single machine at Flexmag was unguarded? The fact that no machine was guarded is precisely what gave Flexmag a `substantial certainty' of injury."
While the evidence regarding the seventy-seven unguarded nip points may not alone establish that appellant knew that injury to appellee was a substantial certainty, we believe that the jury appropriately considered the evidence as circumstantial evidence of appellant's knowledge.
Consequently, after our review of the evidence in the case sub judice
we disagree with appellee that no evidence exists that it knew that injury to appellee was a substantial certainty.
 3 REQUIRED
Appellant next argues that appellee failed to prove that appellant required appellee to perform the dangerous task, despite knowing of the substantial certainty of injury. Appellant claims: (1) that no evidence exists that it instructed appellee to adjust the air hose; and (2) that both appellee and Chalfant thought that further adjustments to the air hose would be unnecessary. Appellant thus asserts that "[i]t is undisputed that [appellee's] decision to adjust the air hose was entirely voluntary." We disagree with appellant.
In the case at bar, the evidence reveals that appellee, as a set-up supervisor, was required to help trouble-shoot machinery problems. While Flexmag management did not explicitly tell appellee to adjust the air hose without locking out the calendar, Flexmag management expected appellee to keep the machines running properly. At the time of his injury, appellee followed the guidance that his supervisor (Chalfant) had earlier demonstrated for appellee.
We further note:
 "Under many circumstances it could be argued that an employee was not required to reach into an unguarded press, to reach into an unguarded opening or to take a wrong step * * *. Certainly employers are not so devious or demented so as to specifically instruct an employee to perform a task that is absolutely certain to result in harm and then stand idly by as the situation unfolds. Such is not and should not be the standard for recovery. The key is that the employer created the dangerous situation and then placed an employee in the work environment where harm is substantially certain to occur based upon the circumstances." Jackson v. Astro Shapes, Inc. (Feb. 29, 2000), Mahoning App. No. 98 CA 179, unreported, discretionary appeal denied (2000), 89 Ohio St.3d 1413, 729 N.E.2d 384.
Consequently, we disagree with appellant that appellee was not required to perform the task.
 C PUNITIVE DAMAGES
Within its first assignment of error, appellant also argues that the trial court erred by failing to direct a verdict regarding appellee's claim for punitive damages. Appellant asserts that clear and convincing evidence does not exist that it acted with actual malice and that no evidence exists that appellant "was consciously aware that the subject nip point posed a `great probability of causing substantial harm' to anyone." Appellant argues that the evidence reveals that appellant "reasonably believed that the calendar was safe" and that "[a] good faith determination of compliance with accepted safety standards * * * defeats any claim that [appellee] acted with `actual malice.'"
Appellee claims that reasonable minds could differ regarding his punitive damages claim. Appellee argues that he:
 "introduced a `mountain of evidence' demonstrating that Flexmag knew that the guard was missing from the back of the calendar machine but failed to replace it, that Flexmag failed to guard any of its machinery, that the floor surface where Brookover fell was `treacherous' from compound and grease, that Flexmag had a policy not to lockout/tagout the calendar machine and that Flexmag did not train its employees."
Appellee further claims that the evidence of the seventy-seven unguarded nip points demonstrates egregious conduct.
In order to be entitled to punitive damages in a tort action, the plaintiff must prove that the defendant acted with "actual malice." Actual malice for the purpose of awarding punitive damages is:
 "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus (emphasis omitted); see, also, Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 445-46, 659 N.E.2d 1242, 1247; Calmes v. Goodyear Tire Rubber Co. (1991), 61 Ohio St.3d 470, 473.
In the case at bar, the record contains competent, substantial evidence to support the jury's decision to award appellee punitive damages. The jury reasonably could have determined from the evidence presented that appellee consciously disregarded the rights and safety of other persons that created a great probability of causing substantial harm. Some evidence reveals that: (1) appellee informed Flexmag management and maintenance personnel that the plexiglass was missing; (2) the plexiglass served as a guard over the inrunning nip point; (3) appellant knew that inrunning nip points were dangerous; and (4) appellant knew that its employees were working on a slippery floor surface around the unguarded, inrunning nip point.
Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.
 II
In its second assignment of error, appellant asserts that the trial court erred by: (1) admitting evidence of an OSHA citation and of an informal settlement agreement; (2) admitting evidence regarding nip points that were not involved in the accident at issue; (3) admitting evidence regarding previous plant inspection reports that did not relate to the calendar machine involved in the accident; and (4) admitting evidence of a prior accident that occurred at a separate and unrelated facility that another company owned. Appellee argues that the trial court did not abuse its discretion.
 A STANDARD OF REVIEW
A trial court enjoys broad discretion when determining the admissibility of evidence. Wightman v. Consolidated Rail Corp. (1999),86 Ohio St.3d 431, 437, 715 N.E.2d 546, 552. Consequently, a reviewing court will not reverse the trial court's decision regarding the admissibility of evidence, absent a showing of an abuse of discretion.Id. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. See, e.g., Landis v. Grange Mut. Ins. Co. (1998),82 Ohio St.3d 339, 342, 695 N.E.2d 1140, 1142; Malone v. Courtyard byMarriott L.P. (1996), 74 Ohio St.3d 440, 448, 659 N.E.2d 1242, 1249.
When applying the abuse of discretion standard, an appellate may not simply substitute its own judgment for that of the trial court. See Stateex rel. Duncan v. Chippewa Twp. Trustees (1995), 73 Ohio St.3d 728, 732,654 N.E.2d 1254, 1258; In re Jane Doe 1 (1991), 57 Ohio St.3d 135,137-138, 566 N.E.2d 1181, 1184; Berk v. Mathews (1990), 53 Ohio St.3d 161,169, 559 N.E.2d 1301, 1308; see, also, Calderon v. Sharkey (1982),70 Ohio St.2d 218, 222, 436 N.E.2d 1008, 1012 ("It is important to remember that the question before [a reviewing] court is not whether the trial court ruled as [the reviewing court] would have ruled if confronted with these questions, but whether the court abused its discretion so as to prejudice [the complaining party]."). Indeed, in order to establish an abuse of discretion, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will, but the perversity of will; not the exercise of judgment, but the defiance of judgment; not the exercise of reason, but instead passion or bias. SeeNakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254, 256,662 N.E.2d 1, 3.
With the foregoing principles in mind, we now consider each of appellant's arguments relating to the admissibility of certain evidence.
 B OSHA CITATION AND SETTLEMENT AGREEMENT
Appellant argues that the trial court erred by admitting evidence of the post-accident OSHA citation and settlement agreement. Appellant asserts that: (1) post-accident OSHA citations are not relevant to an intentional tort claim because such evidence does not help demonstrate substantial certainty but simply negligence or recklessness; (2) the "serious violation" that OSHA issued merely demonstrates negligence, not willfulness;[22] (3) the OSHA citation is an unsubstantiated charge and thus carries no probative value; (4) the prejudicial impact of the OSHA citation outweighed any probative value because the jury likely gave undue weight to the OSHA citation, given that it was issued by a governmental authority; and (5) the trial court's decision to admit evidence of the OSHA citation is contrary to recent case law.
Appellant further asserts that the trial court erred by admitting evidence of the post-accident OSHA settlement agreement. Citing Floyd v.Master Indus., Inc. (Dec. 10, 1999), Darke App. No. 1489, unreported, andHeyman v. Stoneco, Inc. (Aug. 2, 1991), Wood App. No. 90WD071, unreported, appellant claims that an OSHA settlement does not help prove intent. Appellant also argues that admission of the OSHA settlement was highly prejudicial because the jury likely viewed the settlement as an admission of liability. Appellant further asserts that permitting evidence of OSHA settlements would discourage parties from entering into settlements with OSHA.
Appellee argues that the trial court did not err by permitting evidence of the OSHA citation or settlement. Appellee claims that contrary to appellant's argument, the trial court did not allow introduction of the evidence to help appellee establish appellant's intent, but instead permitted the OSHA citation and settlement into evidence because appellant "opened the door" by arguing that the calendar machine complied with OSHA. Appellee asserts: "When [appellant] claimed that its operations fully complied with OSHA requirements, and the calendar machine in particular likewise complied, [appellee] certainly had the right to show that OSHA did not share the same view."
Appellee further argues that the evidence of the OSHA citation and settlement was not unfairly prejudicial and that appellant essentially waived any error with respect to the admission of the OSHA citation and settlement by failing to request a limiting instruction.
While we agree with appellee that the trial court did not abuse its discretion by allowing the OSHA citation and settlement into evidence, we do not agree that appellant "opened the door" to the issue. The transcript of the "Pending Motions Hearing" reveals that the trial court initially ruled that the OSHA citation and settlement would be inadmissible, unless appellant "opened the door." The trial court then reversed its prior ruling, deciding that "the whole thing of OSHA's going to come out" and that "it all goes to weight."
Although appellant raises several reasons why an OSHA citation or settlement is inadmissible in an employer intentional tort case, we note that an OSHA citation may be relevant and admissible at trial to show that an employer committed an intentional tort.[23] See, e.g., Slackv. Henry (Dec. 1, 2000), Scioto App. No. 00 CA 2704, unreported ("Failure to comply with safety regulations is relevant to show that an employer required an employee to perform a dangerous task, knowing of the substantial certainty of injury."); Maddox v. L.O. Warner (Feb. 7, 1996), Montgomery App. No. 15468, discretionary appeal denied (1996),76 Ohio St.3d 1425, 667 N.E.2d 27 (stating that OSHA violations are one of many factors to consider in determining employer's intent).
Furthermore, we believe that appellant has failed to establish that the prejudicial impact of the OSHA citation and settlement agreement substantially outweighed its probative value.
Consequently, we disagree with appellant that the trial court erred by admitting the OSHA citation and settlement into evidence.
 C SEVENTY-SEVEN UNGUARDED NIP POINTS
Appellant argues that the trial court erred by admitting evidence regarding unguarded nip points other than the unguarded nip point where appellee was injured. Appellant claims that the evidence regarding the other nip points did not possess probative value because the other nip points were not located on the calendar and were not discovered until after appellee's injury. Appellant further asserts that the evidence of the other nip points likely confused the jury and that the jury likely found appellant liable "simply because [appellant] should have known that injury would occur because nip points in general are dangerous."
Appellee argues that the trial court properly admitted the evidence of the seventy-seven unguarded nip points to help prove the existence of a "dangerous condition." Appellee also asserts that the trial court properly admitted the evidence of the other unguarded nip points because appellant argued that it had a policy of guarding machines to the maximum extent possible, and, thus, appellee was entitled to show that appellant did not guard to the maximum extent possible.
We do not believe that the trial court abused its discretion by admitting evidence regarding the seventy-seven unguarded nip points located throughout appellant's facility, albeit for reasons other than those appellant and appellee assert. As we noted in our disposition of appellant's first assignment of error, circumstantial evidence often must be introduced to establish the employer's intent to injure an employee. A chronic failure to guard machinery may illustrate such intent. SeeDirksing v. Blue Chip Architectural Products, Inc. (1994),100 Ohio App.3d 213, 653 N.E.2d 718 (considering evidence that employer had a history of failing to provide adequate safety protections to employees and concluding that in light of employer's failure, injury to an employee was only a matter of time). Thus, evidence of the seventy-seven unguarded nip points was relevant to showing appellant's intent.
 D PREVIOUS PLANT INSPECTION REPORT
Appellant also argues that the trial court erred by admitting evidence of a previous plant inspection report that was prepared before appellant installed the calendar. Appellant notes that the report addressed general conditions throughout the plant, but did not specifically relate to the calendar. Appellant claims that evidence that is not related to the accident that caused the employee's injury is not relevant to an intentional tort claim because the evidence does not help demonstrate actual knowledge of the exact dangers that caused the accident. Appellant further contends that the evidence regarding the general plant conditions prejudiced its case because the jury likely based its finding of liability on the general condition of the plant, rather than the condition of the calendar that actually caused the injury. Appellee argues that the plant inspection report was relevant "to confirm the `dangerous condition' [appellant's failure to guard its machines]."
We, again, do not believe that the trial court abused its discretion by allowing the previous plant inspection report into evidence. Again, we note that circumstantial evidence often must be introduced to establish the employer's intent to injure an employee. The evidence revealed in the plant inspection report indicated that appellant had a chronic problem with unguarded, inrunning nip points. Such evidence would help demonstrate, circumstantially, that appellant possessed the requisite intent to injure.
 E PRIOR ACCIDENT
Appellant additionally argues that the trial court erred by admitting evidence of a prior accident that occurred on the front side of the calendar when the calendar was located at RJF. Appellant asserts that the prior accident was not substantially similar to appellee's injury, and, thus was inadmissible. Appellant notes that: (1) appellee's injury occurred on the back of the calendar machine, while the prior accident occurred on the front of the machine; and (2) the prior nip point injury occurred in a different configuration of rolls than appellee's injury. Appellant thus contends that the prior accident was not substantially similar because the prior accident occurred in a different location that posed different hazards.
Appellee asserts that the trial court did not err by permitting testimony regarding the prior accident. Appellee claims that appellant "opened the door" by asking witnesses questions such as: "[D]id you ever feel that you were substantially likely to get caught in the nip point that I just pointed out?" Appellee further argues that even if the prior injury occurred in a different location from the location where appellee was injured, the trial court nevertheless possessed discretion to allow the evidence.
A trial court may admit evidence of prior accidents if the prior accidents "`occurred under circumstances substantially similar to those at issue in the case [under consideration].'" Renfro v. Black (1990),52 Ohio St.3d 27, 31, 556 N.E.2d 150, 154 (quoting McKinnon v. SkilCorp. (C.A.1, 1981), 638 F.2d 270, 277). A trial judge has wide discretion when determining the admissibility of prior accidents and a reviewing court will not reverse the trial court's decision "absent a clear showing of abuse of discretion." Renfro, 52 Ohio St.3d at 32,556 N.E.2d at 155.
In the case sub judice, appellant's assertion that the prior accident was not substantially similar to appellee's accident does have arguable merit. The trial court, however, in the exercise of its discretion must determine whether to admit this particular evidence. We do not believe that in order to be admitted into evidence, an accident must have occurred in the exact place and the exact manner as the injury in question. When examining and comparing a prior injury, a court must balance all factors to determine whether the injuries, although not exactly the same, are substantially similar. In the instant case, we believe that the two injuries are not so dissimilar that a conclusion must be reached that the trial court abused its discretion in admitting the evidence. Moreover, in light of the other evidence demonstrating that appellant committed an intentional tort, if the admission of evidence of the prior accident does in fact constitute error, the trial court's error does not require a reversal. See Civ.R. 61 (stating that a court shall disregard errors that do not affect the parties' substantial rights).
Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.
 III
In its third assignment of error, appellant argues that the trial court: (1) improperly instructed the jury regarding the definition of "substantial certainty"; (2) erred by refusing to instruct the jury on the concepts of negligence and recklessness; and (3) erred by refusing to limit the jury's consideration of appellant's knowledge to the conditions at the rear of the calendar. Appellant asserts that the jury, without clarification as to the difference between negligence, recklessness, and substantial certainty, likely applied a negligence standard when deliberating. Appellant further contends that the jury, after hearing evidence regarding the general plant conditions and the seventy-seven unguarded nip points, may not have understood that it was to evaluate appellant's knowledge as to the calendar machine, and not appellant's knowledge as to other conditions throughout the plant.
Appellee argues that construing the court's instructions as a whole, the trial court properly instructed the jury regarding an employer intentional tort. Appellee asserts that the trial court was not obligated to give appellant's proposed instruction because appellant's proposed instruction did not accurately state the law. Appellee notes that the trial court's jury instruction regarding intentional tort was taken verbatim from Ohio Jury Instructions ("OJI"). Appellee further argues that appellant's contention that the trial court should have limited the jury's consideration of appellant's knowledge as it relates to the rear of the calendar "is a disguised request that the trial judge rewrite the intentional tort standard." Appellee contends: "There is no requirement that the employer know the exact location at which the injury will occur in the syllabus of Fyffe. Indeed, under Fyffe, a plaintiff must show a `dangerous process, procedure or condition within [the employer's] business operation.'" Appellee dismisses appellant's claim of jury confusion by noting that the jury heard eight days of testimony regarding the rear of the calendar. Appellee claims: "It was not possible for the jury to think that any location other than the rear of the calendar machine was involved."[24]
"Generally, the trial court should give requested instructions `if they are a correct statement of the law applicable to the facts in the case.'"Morford v. Amex Life Assur. Co. (Dec. 31, 1998), Lawrence App. No. 98 CA 7, unreported (quoting Murphy v. Carrollton Mfg. Co. (1991),61 Ohio St.3d 585, 591, 575 N.E.2d 828). "In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and `must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'"Kokitka v. Ford Motor Co. (1995), 73 Ohio St.3d 89, 93, 652 N.E.2d 671,674 (quoting Becker v. Lake Cty. Mem. Hosp. W. (1990), 53 Ohio St.3d 202,208, 560 N.E.2d 165, 171). Whether the jury instructions correctly state the law is a question of law which an appellate court reviews de novo. See Morford (citing Murphy, 61 Ohio St.3d at 591, 575 N.E.2d at 832). A trial court need not give a party's requested jury instruction verbatim as long as the trial court's instruction as a whole accurately conveys the relevant law. See Youssef v. Parr, Inc. (1990), 69 Ohio App.3d 679,690, 591 N.E.2d 762, 769. When "a special instruction given by the court correctly states the law pertinent to one or more issues of the case, the giving of it does not constitute error, even though it is not a full and comprehensive statement of the law." Id., 69 Ohio App.3d at 690,591 N.E.2d at 769. "Additionally, the existence of a proposed jury instruction which correctly states the issues or law in question does not mandate that the court use the proposed jury instruction verbatim. The court need only include the substance of the proposed instruction." Id.,69 Ohio App.3d at 691, 591 N.E.2d at 770.
"The failure to give a requested jury instruction is not reversible error if the law is expressed to the jury clearly and fairly enough to enable the jury to understand the law as it applies to the facts in the case." Reese v. Euclid Cleaning Contrs., Inc. (1995), 103 Ohio App.3d 141,147-48, 658 N.E.2d 1096, 1100 (citing Deffinbaugh v. Ohio Turnpike Comm. (1990), 67 Ohio App.3d 692, 701-702, 588 N.E.2d 189, 194-195); see, also, Morford, supra. "Moreover, it is within the sound discretion of a trial court to refuse to admit proposed jury instructions which are either redundant or immaterial to the case." Youssef,69 Ohio App.3d at 691, 591 N.E.2d at 770 (citing Bostic v. Connor (1988), 37 Ohio St.3d 144,524 N.E.2d 881, paragraph two of the syllabus). Thus, a reviewing "court will not reverse unless an instruction is so prejudicial that it may induce an erroneous verdict." Id.
In Reese, the trial court instructed the jury as follows:
 "`The plaintiff must prove by the greater weight of the evidence that the defendant employer subjected the decedent to a dangerous condition of employment with an intent to injure the decedent or other employees, or that the defendant committed an act with knowledge that injury to the decedent or other employees was substantially certain to occur.
 In order to show this intent, plaintiff must prove that the defendant knew of the existence of the dangerous equipment within his business operation, that the defendant knew that harm to an employee was substantially certain to occur, and that the defendant required the decedent to continue to perform the dangerous task.'" Reese, 103 Ohio App.3d at 148, 658 N.E.2d at 1100.
The Reese court concluded that the trial "court's instructions accurately reflected the applicable law." Id.
In Teters v. Continental Hydraulic Hose Corp. (Dec. 28, 1988), Wyandot App. No. 16-85-22, unreported, the trial court declined to include the following language in the jury instructions in an employer intentional tort case:
 "It is this element of substantial certainty which distinguishes a merely negligent act from intentionally tortious conduct. Where a defendant acts despite his knowledge that the risk is appreciable, his conduct is negligent. Where the risk is great, his actions may be characterized as reckless or wanton, but not intentional."
The trial court determined that because neither negligence nor recklessness were issues in the case, the language would be "irrelevant and confusing to the jury." On appeal, the court concluded that the trial court properly "charge[d] the jury as to the essentials of proof to be made by the plaintiff which would entitle [the plaintiff] to a verdict." The court stated that the trial court was not obligated to charge the jury "as to the negative aspects of [the essentials of the plaintiff's proof]" or as to "situations not at issue in the case which might, if found, relieve the defendant from liability." The court explained:
 "It seems to us that to interpret language pertaining to negligent, reckless or wanton actions as part of the definition of substantial certainty, would surely require the trial court to provide some further definition of those terms for the benefit of a lay jury. In short, reading that language to the jury would strike us as similar to instructing a jury in a criminal case that proof beyond a reasonable doubt must be greater than either a preponderance or clear and convincing prof without explaining those terms as well. Yet, in our view, to require the explanation of such additional terms would lead to increasingly cumbersome instructions which would be unnecessarily confusing to the jury and extraneous to the issues of proof."
In Seth v. Capitol Paper Co. (Aug. 29, 1990), Montgomery App. No. 11539, unreported, the trial court instructed the jury in an employer intentional tort case as follows:
 "To establish [an intentional tort], you [the jury] must find by a preponderance of the evidence (1) that the Defendant knew of the existence of a dangerous process, procedure, instrumentality, or condition within its business operation; and (2) that the Defendant knew that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee was a substantial certainty and not just a high risk; and (3) that the Defendant, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."
On appeal, the employer argued that the trial court erred by refusing to instruct the jury as to the definition of substantial certainty. The court of appeals disagreed, and concluded that the failure to define substantial certainty did not "render the charge prejudicially flawed." Instead, the court determined: "Examining the total charge, we note that the court correctly emphasized that `substantial certainty' was higher than high risk and that [the employee] had to show [the employer] knew of the substantial certainty of injury." The court further observed:
 "[T]he term `substantial certainty,' albeit a term representing a legal concept, is not so remote from the ordinary juror's appreciation as to require an exhaustive and potentially confusing definition of the meaning. * * * One can reasonably conclude that a juror of average intelligence and experience would grasp the idea that substantial certainty connotes a high degree of proof that exceeds the proof necessary to demonstrate mere negligence or recklessness."
In the case at bar, the trial court instructed jury as follows:
 "Here, the plaintiffs claim that Jeff Brookover's injuries were caused by the defendant's wrongdoing. To prove Flexmag liable, the plaintiffs must prove by the greater weight of the evidence, i.e., a preponderance of the evidence, that Flexmag first of all knew of the existence of the dangerous equipment or conditions within its business operation; secondly, knew that harm to an employee was substantially certain to occur; and, thirdly, nevertheless, required the plaintiff to continue to perform the dangerous task."
Appellant requested the court to instruct the jury as follows:
 "The Plaintiff must prove by the greater weight of the evidence that Defendant Flexmag subjected Plaintiff to a dangerous condition of employment by requiring him to work on or near the back of a calendar machine with an intent to injure the Plaintiff or another, or that Defendant required Jeff Brookover to work at the back of the calendar machine with the knowledge that injury to the Plaintiff or others was substantially certain to occur.
 "In order to establish `intent' for the purpose of proving the existence of an intentional tort, Plaintiff must demonstrate the following by a preponderance of the evidence:
 "(1) knowledge by Flexmag of the existence of a dangerous process, procedure, instrumentality or condition at the back of the calendar machine;
 "(2) knowledge by Flexmag that if Jeff Brookover or another employee was exposed by his employment to such dangerous process, procedure, instrumentality or condition at the back of the calendar machine, then harm to the employee would be a substantial certainty; and,
 "(3) that Flexmag, under the circumstances which existed at the back of the calendar machine, and with knowledge of such circumstances, did act to require Jeff Brookover to continue to perform a known dangerous task.
 "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the possibility that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk something short of substantial certainty is not intent.
"* * *
 "Finally, the plaintiff has the burden of proving by a preponderance of the evidence that the employer had `actual knowledge' of the exact dangers which ultimately caused `injury.'"
We note that in the instant case, the trial court instructed the jury according to the standard that the Ohio Judicial Conference approved and published in OJI. See Youssef, 69 Ohio App.3d at 692, 591 N.E.2d at 770
(concluding that the trial court did not abuse its discretion when the trial court instructed the jury according to the intentional tort standard instruction set forth in OJI). Moreover, the trial court's jury instruction appropriately stated the applicable law as the state of the law currently exists.
Although the trial court may not have instructed the jury that it had to find that appellant had exact knowledge of the danger that ultimately caused appellant's injury, the omission does not render the trial court's instructions fatally flawed. See Feldon, 91 Ohio App.3d at 65-66,631 N.E.2d at 700 (disagreeing with the employer that the trial court was required to give an instruction as to the employer's "actual knowledge of the exact dangers giving rise to [the employee's] injuries"). The trial court's instructions stated the law as announced in Fyffe.
While the jury instructions in the case sub judice may not have been as complete as appellant had desired, we do not believe that a probability exists that the court's charge "misled the jury in a matter materially affecting [appellant's] substantial rights."[25] Kokita, supra.
Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.
 IV
Although not posed as an assignment of error, appellant further argues that the cumulative effect of the trial court's errors denied appellant of a fair trial.
We do not believe that appellant was denied a fair trial. None of the errors appellant complains of prejudiced appellant. The one harmless error that we recognized (admission of prior dissimilar accidents) did not deprive appellant of a fair trial.
Thus, we conclude the appellant's argument that the cumulative effect of the trial court's alleged errors deprived it of a fair trial is without merit.
 V
In their first cross-assignment of error, appellees assert that the trial court erred by not awarding appellees attorney fees that equal their full contingency fee. Appellees contend that the trial court erred by using a fixed hourly rate to calculate an appropriate attorney fee award.
On June 26, 2000, the trial court held a hearing regarding the amount of attorney fees to award appellees as part of their damages in this case. Appellees' lead counsel, Edward Clark, testified that his firm represented appellees on a forty percent contingency basis. Clark asserted that the trial court should award attorney fees in accordance with appellees' and counsel's arrangement. Clark explained that a contingency fee contract is standard when representing plaintiffs in intentional tort cases.
Clark also stated that his firm did not keep any time records concerning appellees' case, but he estimated that his firm expended approximately 1200 — 1300 hours of work. He further testified that the last time he worked on an "hourly" fee basis, he charged $300 to $400 per hour.
Attorney Eric Zagrans testified as an expert witness and stated that a forty percent contingency fee award is reasonable. Zagrans further opined that, insofar as an actual dollar amount was concerned, $2,391,000 in fees is reasonable, fair and appropriate under the circumstances. In computing the amount, Zagrans discussed the factors set forth in DR 2-106(B), including the contingent fee contract between appellees and their attorneys, which he characterized as an important consideration.
Attorney Joseph Gerling testified as an expert witness for appellant and stated that, while he has previously worked on a plaintiff's case on a contingency fee basis, his firm nevertheless kept time records. Gerling stated that he reviewed the voluminous files collected in the case at bar and estimated that appellees' counsel spent approximately 1,080.9 hours working on appellees' case. Gerling reviewed the factors set forth in DR 2-106(B) and opined that a reasonable rate for appellees' attorneys would be $200 per hour.
On August 8, 2000, the trial court awarded $403,162.50 in attorney fees. In reaching its decision, the court noted that "a contingency fee agreement may not automatically serve as a basis for an award of attorney fees against a stranger to that agreement." Rather, the court continued, attorney fees should be based on the factors set forth in DR 2-106(B). The court then engaged in a very thorough analysis of the facts and circumstances of the present case relative to those factors:
 "This was an extremely complex and difficult case. The case was a multi-day jury trial involving numerous lay and expert witnesses. The Plaintiffs sought the assistance of numerous attorneys before they found attorneys that would even take their case. Initially, the case was filed by Attorney Cook in Marietta, Ohio, with the understanding that the Complaint was only being filed to prevent the running of the statute of limitations. The case was then voluntarily dismissed subject to being refiled within the one year allowed under the Ohio Rules of Civil Procedure. All the parties concede that the Plaintiffs' primary attorneys, Attorney Ed Clark and Attorney Jim Arnold, are extremely skilled and of the highest professional, ethical and legal caliber. This case consumed a great amount of effort and time on behalf of all attorneys and parties. In point of fact, all of the attorneys involved in this case did honor to the legal profession by their diligent representation of their respective clients. There was extensive discovery done in this case. There were extensive pre-trial motions which required extensive research and briefing on complex and novel issues of law. After a 9 day trial, a jury awarded a significant amount of damages in this case. It goes without question that the Plaintiffs' attorneys expended a great amount of time and labor on a case that presented novel and difficult questions of law and required the highest level of legal skill to process. It also would go without question that the acceptance of this case by the Plaintiffs' lawyers did preclude other employment for those attorneys. It also is supported by testimony that the fees customarily charged in this locality for this type of case were reasonable and necessary whether computed on an hourly or a contingency basis. The result involved in this case was a substantial award of actual and punitive damages by a jury. The discovery in this case was extensive and exhaustive on all of the attorneys."
The trial court concluded that Clark and Arnold expended 1,075.1 hours between them and that $375 per hour constituted a reasonable fee. That fee was multiplied by the aforementioned hours to arrive at a total fee of $403,162.50.
In their first assignment of error, appellees/cross-appellants argue that the trial court erred by not awarding them their "full contingency fee." We disagree with appellees.
A trial court may award attorney fees to a plaintiff who prevails on a claim for punitive damages. See Galmish v. Cicchini (2000),90 Ohio St.3d 22, 35, 734 N.E.2d 782, 795; Columbus Finance, Inc. v.Howard (1975), 42 Ohio St.2d 178, 183, 327 N.E.2d 654, 658. "In other words, "`[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.'"Galmish, 90 Ohio St.3d at 35, 734 N.E.2d at 795 (quoting Zoppo v.Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 558, 644 N.E.2d 397,402).
The appropriate amount of attorney fees to award in a given case rests in the sound discretion of the trial court. See Bittner v. Tri-CountyToyota, Inc. (1991), 58 Ohio St.3d 143, 146, 569 N.E.2d 464, 467; see, also, Freeman v. Crown City Mining, Inc. (1993), 90 Ohio App.3d 546,552, 630 N.E.2d 19, 23; Nielson v. Bob Schmidt Homes, Inc. (1990),69 Ohio App.3d 395, 399, 590 N.E.2d 1291, 1293. Thus, a reviewing court should not reverse a trial court's determination as to the amount of attorney fees absent an abuse of that discretion. Bittner,58 Ohio St.3d at 146, 569 N.E.2d at 467; see, also, Brandon/Wiant Co. v. Teamor
(1999), 135 Ohio App.3d 417, 423, 734 N.E.2d 425, 429; Atwood Resources,Inc. v. Lehigh (1994), 98 Ohio App.3d 293, 300, 648 N.E.2d 548, 552. We again note that an abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. See Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 448, 659 N.E.2d 1242, 1249; State ex rel.Solomon v. Police Firemen's Disability Pension Fund Bd. of Trustees
(1995), 72 Ohio St.3d 62, 64, 647 N.E.2d 486, 488; Steiner v. Custer
(1940), 137 Ohio St. 448, 31 N.E.2d 855, at paragraph two of the syllabus. Appellate courts must not simply substitute their judgment for that of the trial court. See State ex rel. Duncan v. Chippewa Twp.Trustees (1995), 73 Ohio St.3d 728, 732, 654 N.E.2d 1254, 1258; In reJane Doe 1 (1991). 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181, 1184;Berk v. Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308. Indeed, to show an abuse of discretion, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254, 256,662 N.E.2d 1, 3.
In determining the amount of attorney fees, a court should consider the following factors: (1) the time and labor involved in maintaining the litigation; (2) the novelty, complexity and difficulty of the questions involved; (3) the professional skill required to perform the necessary legal services; (4) the experience, reputation and ability of the attorneys; (5) the miscellaneous expenses of the litigation; (6) the fee customarily charged in the locality for similar legal services; and (7) the amount involved and the results obtained. See Villella v. WaikemMotors, Inc. (1989), 45 Ohio St.3d 36, 41, 543 N.E.2d 464, 470;Hutchinson v. J.C. Penney Cas. Ins. Co. (1985), 17 Ohio St.3d 195, 200,478 N.E.2d 1000, 1005; see, also, Summa Health Systems v. Viningre
(2000), 140 Ohio App.3d 780, 792, 794 N.E.2d 344, 353; Furr v. State FarmMut. Auto Ins. Co. (1998), 128 Ohio App.3d 607, 627-628, 716 N.E.2d 250,265.[26]
The foregoing factors closely parallel the following factors set out in DR 2-106(B) for determining appropriate attorney fees:
 "(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
 "(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
 "(3) The fee customarily charged in the locality for similar legal services.
"(4) The amount involved and the results obtained.
 "(5) The time limitations imposed by the client or by the circumstances.
 "(6) The nature and length of the professional relationship with the client.
 "(7) the experience, reputation, and ability of the lawyer or lawyers performing the services.
"(8) Whether the fee is fixed or contingent."
In the case sub judice, the trial court fully considered each of the foregoing factors. The court expressly noted the time and effort expended, the novelty and complexity of the legal issues, the attorneys' skill, and the results of the litigation. The court also weighed the reasonableness of a contingency fee against an hourly rate. On balance, the court determined that an hourly fee was the most reasonable method to calculate an appropriate attorney fee. The court determined that appellees' counsel expended 1,075.1 hours on the case. We believe that the trial court's finding is within the range of testimony that various witnesses gave during the hearing.
The trial court then multiplied the total hours by $375, (i.e. the amount the trial court determined to be a reasonable hourly fee). The $375 hourly fee is exactly the amount that Zagrans, appellees' own expert, testified was a reasonable hourly fee. The amount also is greater than the $200 hourly fee suggested by appellant's expert, Gerling, and is in the upper range of fees that Clark testified he would charge if he billed on an hourly basis ($300 — $400 per hour).
Furthermore, we note that the attorney fee actually awarded to appellees ($403,162.50) is not, by any measure, an insignificant amount and does not appear to be unreasonable. By contrast, if the trial court awarded the fee that appellees' sought, a strong argument could be made that the fee is unreasonable. We note that Zagrans testified that if the fee sought by cross-appellants is divided by the number of hours, the fee would represent approximately $1,500 per hour. Although Zagrans claimed that $1,500 per hour is reasonable, we believe that the trial court could reasonably conclude otherwise.
Appellees nevertheless assert that the trial court erred by failing to award them the full amount due under the contingent fee agreement. We believe, however, that several flaws exist in appellees' argument. First, nothing in either Villella or Hutchinson states that contingent fee agreements are an appropriate factor to consider when awarding attorney fees resulting from a punitive damages award. DR 2-106(B) admittedly lists such agreements as a factor, but the Ohio Supreme Court has not expressly held that contingent fee agreements are a factor to be considered in the context of punitive damages.[27] Second, even assuming arguendo that the existence of a contingent fee agreement is a proper factor to consider, we find nothing to suggest, as appellees urge, that it is the sole factor to be considered. Indeed, Ohio the Supreme Court has indicated otherwise.
In Landis v. Grange Mut. Ins. Co. (1998), 82 Ohio St.3d 339, 342-343,695 N.E.2d 1140, 1143, the court held that to award attorney fees to the prevailing party based on that party's contingent fee agreement with the party's legal counsel constitutes an abuse of discretion. The court noted that such an agreement is a bargained contract that allocates risk and reward between counsel and client. There is no reason, however, for the losing party to be bound by that agreement. The Court explained that the losing party "did not receive the benefit of transferring risk to an attorney" and, more importantly, "did not bargain for the contingency feecontract." Id. (emphasis added.)
Other Ohio courts have taken similar positions. In Stacy v. NationwideMut. Ins. Co. (1998), 125 Ohio App.3d 658, 672, 709 N.E.2d 519, 528-529, the court held that the trial court erred by using a contingent fee agreement to award attorney fees because it was unfair to hold a third-party adversary to the terms of another's bargain. In Sauder v.McKeown (Mar. 19, 2001), Richland App. No. 00-CA-81, unreported, the court found no error in the decision to reject a contingency fee contract and to award attorney fees on the basis of actual hours worked and services provided. In Blancett v. Nationwide Care, Inc. (Dec. 16, 1998), Guernsey App. No. 98CA4, unreported, the Court held that it was error to award attorney fees based on a contingent fee contract without considering the other factors in DR 2-106(B).[28]
Thus, the foregoing cases indicate that, although the existence of a contingent fee agreement is one factor to consider when a court determines a reasonable amount of attorney fees to award with punitive damages, it is not the controlling factor. Although appellees analyze the other factors set forth in DR 2-106(B), the underlying premise of appellees' argument is that subsection (B)(8), the existence of a contingent fee contract, should have controlled the trial court's decision. This is not the law in Ohio.
Appellees rely on Central Trust Co., N.A. v. Warburg (1995),104 Ohio App.3d 186, 661 N.E.2d 275, and Savage v. Thomas (Aug. 18, 1995), Lake App. No. 94-L-062, unreported, as authority for the argument that their contingent fee agreement should have been the basis for the trial court's attorney fee award and that the failure to use that agreement constitutes reversible error. Appellees' reliance on those authorities is misplaced, however. First, both Central Trust and Savage
pre-date the Landis decision in which the Supreme Court clearly discounted the use of contingency agreements. Second, both cases can be reconciled with an affirmance in the cause sub judice.
The Central Trust court affirmed an attorney fee award based on a contingency fee contract as within the trial court's discretion.104 Ohio App.3d at 189-190, 661 N.E.2d at 277. Although we question the continued validity of the Central Trust ruling in light of Landis, an affirmance in the case at bar merely upholds the trial court's discretionary ruling on the issue of attorney fees. Our decision should not be construed to state that a contingency fee contract cannot be considered. Rather, we hold that the trial court did not abuse its discretion in placing less reliance on the existence of the contingency fee contract than the other factors that it considered.
Likewise, the Savage court held that, although trial courts are not bound by contingency contracts, such contracts must be considered when deciding reasonable fees. This is consistent with our decision to affirm the attorney fee award in the case sub judice. While the trial court may, of course, consider the contingent fee agreement, which it clearly did, the court is not bound by that agreement.
In sum, we find no error with the trial court's decision, let alone any abuse of discretion. We note that the trial court possesses complete discretion to determine which factors to apply and in what manner that application will affect the attorney fee calculation. Bittner, supra at 146, 569 N.E.2d at 467; see, also, Hess v. Toledo (2000),139 Ohio App.3d 581, 587, 744 N.E.2d 1236, 1240. The record reveals that the trial court did consider the contingent fee agreement, along with the other factors in Villella, Hutchinson, and the disciplinary rule. Obviously, the court afforded very little weight to the contingency fee agreement.
Additionally, we again note that trial court's conclusion with respect to the number of hours expended in this litigation is within the range that the witnesses testified to during the hearing. The hourly rate that the trial court selected was the same rate testified to by appellees' own expert and was considerably higher than the rate appellant's expert would have afforded them.
Finally, the attorney fees appellees sought would have produced an inflated rate of approximately $1,500 per hour. In light of the foregoing, we do not find that the trial court's decision to fix an hourly rate and award attorney fees, in an amount in excess of $400,000, was arbitrary, unreasonable or unconscionable.
Accordingly, based upon the foregoing reasons, we overrule all of appellant's assignments of error and appellees' first cross-assignment of error. Appellees remaining cross-assignments of error are moot. See App.R. 12(A)(1)(c).
JUDGMENT AFFIRMED.
[1] As used throughout the remainder of this opinion, "appellee," unless otherwise noted, refers to Jeffrey Brookover.
[2] We note that appellee did not specify the particular "rollers" that the employee would be in close contact.
[3] The record does not reveal who removed the plexiglass or exactly why the plexiglass was removed. Appellee stated that he had been told that a Flexmag employee broke the plexiglass and that the plexiglass would be replaced.
[4] {¶ a} Throughout the trial, appellant insisted that the plexiglass was nothing more than a shield to prevent crumbs from falling onto the product. Appellee, however, maintained that the plexiglass was a guard that would have prevented appellee's injury.
{¶ b} Larry Miller, an RJF International employee, stated that the purpose of the plexiglass was "to keep crumbs and material from hitting the rolls when [it] was running" and that it also served a safety purpose by keeping employees "out of that general area." Miller further stated that the plexiglass originally was "put up not as a guard. It was put up for a dust cover originally. That's the reason for it to be in existence. But it also will serve as a guard."
{¶ c} Appellee explained that he thought the calendar machine was unsafe without the plexiglass in place and that he thought the plexiglass served a safety purpose rather than a production purpose.
[5] To "lock out" a machine is to de-energize the machine so that it will not accidentally start.
[6] {¶ a} Chalfant offered the following explanation of how the calendar machine operates:
{¶ b} "[Y]ou had a granulator that sat back from this piece of equipment. The mill operators would actually bring you the compound that would be like in a slab, kind of wide like matting, and then you fed pieces down in the granulator and it chewed them up into real small, little like flat I don't know how to describe it. Sort of a it had rubber in it so it wasn't like a solid, but it was like little flat shavings that fell through the granulator into a catch pan.
{¶ c} After it was caught in the catch pan, you'd fill that pan up, you'd roll that one out, you'd roll an empty one in and continue to granulate so you'd have some. And then basically you took a shovel and you threw it up in between the two top rolls on this calendar. And once you got enough up in there you fill that up, you started the machine up, and it compressed the sheet and granules into a flat sheet formed between the rolls."
[7] The employees did not clarify whether they were referring to rollers near an inrunning nip point or to rollers near an outgoing point.
[8] On the date of appellee's injury, the calendar machine was high on the "priority list." When a machine was on the priority list, the machine needed to be kept running in order to fulfill orders.
[9] The record is not clear as to the precise location where appellee and Chalfant were positioned when they initially installed the air hoses.
[10] The record is not clear as to whether appellee, at the time of his injury, performed the task in exactly the same manner as he had when appellee and Chalfant initially installed the air hoses.
[11] A job safety analysis identifies dangers associated with a machine and advises an employer to either eliminate the danger or to implement appropriate safeguards.
[12] Although appellant argued in its motion for summary judgment that the nip point was approximately forty-four inches above the floor, no trial testimony spoke specifically to the height of the nip point. We do note, however, that the jury saw a life-size replica of the calendar machine and the nip point.
[13] We note that Rennell emphasized that his opinion was based on the assumption that an employee would be working near the hazard "on a regular basis."
[14] {¶ a}The record contains a copy of "A Word From Tom Dziedzic," published in "Flexmag Monthly" in May 1997:
{¶ b} "As you are all aware Flexmag is exceedingly busy at the present time. Shipping $ records are being broken almost daily and our order backlog is at an all time high. In order to give you a better perspective of the intense level we are at consider this! In May of 1997 we consumed over 1,750,000 pounds of ferrite powder and shipped in excess of 2,000,000 pounds of product. That's the good news!
{¶ c} "The bad news is that our lead times are now extended to 4-6 weeks and are disrupting our cu[s]tomer base. In addition we are all being asked to work longer hours in a very high intensity atmosphere. In short both our equipment and employees are being strained. This can lead to serious safety problems. And I ask that each and every employee place their own safety and the safety of their f[e]llow employees as their NUMBER ONE priority.
{¶ d} "You may ask what is being done to relieve the strain? First, we are increasing our workforce in order to meet the increasing production. And secondly, new equipment is being added or is in the planning stage.
{¶ e} But PLEASE REMEMBER, `SAFETY IS JOB NUMBER ONE.'"
[15] We note, however, that Chalfant stated that he and appellee did not come in close contact with the unguarded nip point.
[16] {¶ a} In Patton v. JH Reinforcing and Structural Erectors,Inc. (Dec. 9, 1994), Scioto App. No. 93-CA-2194, unreported, we explained:
{¶ b} "[U]nder Ohio law, there are two distinct types of intentional tort. The first is where the employer's conduct achieves the exact result desired, i.e., during a quarrel the employer hits the employee in the head with a wrench. In the second type of case, intent is imputed to the employer where it knows the conduct is substantially certain to cause a particular result, even if it is not desired, i.e., employer subjects the employee to highly radioactive material without protective measures."
[17] {¶ a} In Van Fossen, the court explained the intent requirement as follows:
{¶ b} "[I]ntent is broader than a desire to bring about the physical results, and * * * it extends to those consequences the actor believes are substantially certain to follow from what he does. However, * * * `the mere knowledge and appreciation of a risk something short of substantial certainty is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but it is not an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. The line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the actor a substantial certainty.'" Id., 36 Ohio St.3d at 115, 522 N.E.2d at 503
(quoting Prosser Keeton, Law of Torts (5 Ed. 1984), 36, Section 8).
[18] {¶ a} We pause to observe that reciting the law applicable to intentional tort claims is easier than applying the law to particular facts. While the black letter law appears to be clearly stated, courts are left in a quandary when they attempt to determine whether certain facts demonstrate "substantial certainty." This court is not the first court to recognize the difficulty in evaluating intentional tort claims. See, e.g., Clark v. Energy Unlimited, Inc. (1990), 69 Ohio App.3d 533,538-39, 591 N.E.2d 279, 282-83 (Harsha, J., concurring). As Justice Douglas noted in his concurring opinion in Fyffe, prior decisions from the Ohio Supreme Court have "`accomplish[ed] the seemingly impossible feat of leaving this area of the law more confused than [the court] found it.'" Fyffe, at 120, at 1114 (Douglas, J., concurring) (quoting VanFossen, 36 Ohio St.3d at 120, 522 N.E.2d at 507 (Douglas, J., dissenting)). As Justice Douglas recognized: "The problem is, however, how `high' or `great' must a risk be before it can be said that the creation of the risk is substantially certain to produce injury? How high is `high'? How great is `great'?" Id., at 121 at 1114.
{¶ b} The case at bar well-documents the difficulty in applying the substantial certainty standard. Any number of cases appear to support appellant's position. See, e.g., Trojan v. Ro-Mail Indus., Inc. (Aug. 19, 1998), Summit App. No. 18778, unreported; Caldwell v. Buckeye SteelCastings Co. (Mar. 24, 1998), Franklin App. No. 97APE07-963, unreported;DeLong v. Springfield Newspaper, Inc. (Sept. 27, 1996), Clark App. No. 95-CA-125, unreported; Wesley v. Northeast Ohio Regional Sewer Dist. (Feb. 22, 1996), Cuyahoga App. No. 69008, unreported. Conversely, any number of cases also appear to support appellee's position. See, e.g.,Long v. International Wire Group, Inc. (Aug. 22, 2000), Crawford App. No. 3-2000-11, unreported; Jackson v. Astro Shapes, Inc. (Feb. 29, 2000), Mahoning App. No. 98 CA 179, unreported; Sindel v. MidwestStamping Mfg. Co. (Sept. 11, 1998), Williams App. No. WM-97-032, unreported.
{¶ c} Perhaps what renders the case at bar more difficult than most is that appellee's injury did not occur at the point of operation, i.e. the point at which an employee would be working during the normal operation of the machine. Little doubt exists that if appellant knew that appellee was required to come into contact with an inrunning, unguarded nip point as a usual day-to-day condition of his employment, a substantial certainty of injury would certainly exist. Instead, at the time of his injury, appellee performed a non-routine task, one that he had performed only once before, and one which no employee, prior to the date of his injury, had ever performed.
{¶ d} In light of this and other important issues present in the case sub judice, we welcome further review and scrutiny by the Ohio Supreme Court.
[19] Contrary to appellant's assertion, a lack of prior accidents does not "negate" substantial certainty. Instead, a lack of prior accidentsmay indicate that the employer did not have knowledge that injury to an employee was a substantial certainty. Thus, although the lack of a prior injury is not fatal to a plaintiff's case, it does constitute evidence that tends to show that an employer did not have knowledge that an injury was substantially likely to occur. See, e.g. Taulbee v. Adience, Inc. (May 29, 1997), Franklin App. No. 96APE11-1502, unreported; Knott v.Bridgestone/Firestone Tire Rubber Co. (Sept. 25, 1996), Summit App. No. 17829, unreported, Cook v. Cleveland Elec. Illuminating Co.(1995),102 Ohio App.3d 417, 657 N.E.2d 356; Foust v. Magnum Restaurants, Inc. (1994), 97 Ohio App.3d 451, 646 N.E.2d 1150; Blanton v. InternationalMinerals Chemical Corp. (1997), 125 Ohio App.3d 22, 707 N.E.2d 960.
[20] {¶ a}We note that at least one court has drawn a line between "primary" guards and "secondary" or "ancillary" guards. See Walton v.Springwood Products, Inc. (1995), 105 Ohio App.3d 400, 405,663 N.E.2d 1365, 1369. The Walton court stated:
{¶ b} "[W]here the safety feature omitted is not a secondary or ancillary guard, but the primary protective device, the failure of the employer to attach such a guard creates a factual issue which would be sufficient to overcome a summary judgment exercise under the rule announced in Fyffe." Id.
{¶ c} Thus, according to the Walton court, if the guard is not a "primary" guard, the employer's removal of the guard would not be relevant under a substantial certainty analysis. Even were we to agree with theWalton court's distinction between "primary" and "secondary" guards, we note that conflicting evidence exists in the case at bar as to whether the plexiglass was a "primary" or "secondary" guard.
[21] See Wehri v. Countrymark, Inc. (1992), 82 Ohio App.3d 535, 539,612 N.E.2d 791, 794 ("[I]t is illogical to assume that the highest ranking persons in the Lima facility were willing to intentionally subject themselves to substantially certain injury, possibly death.");Myers v. Oberlin Processing, Inc. (Sept. 27, 1996), Seneca App. No. 13-96-20, unreported.
[22] {¶ a} In its appellate brief, appellant notes that according to the OSHA Field Inspection Reference Manual, which appellant attached to its appellate brief, "a `serious violation' is issued where the employer knew or could have known of the dangerous condition," a "willful violation" is issued when employer consciously or intentionally disregarded an OSHA regulation.
{¶ b} Appellee contends that because appellant did not introduce the OSHA Field Inspection Reference Manual into evidence at trial and because appellant did not raise this particular argument during the trial court, this court is prohibited from considering the above definitions from the OSHA Field Inspection Reference Manual and from considering this particular argument.
{¶ c} We will not consider appellant's argument that relies upon the OSHA Field Inspection Reference Manual. On June 21, 2001, this court granted appellee's request to strike the exhibits from appellant's brief.
[23] {¶ a} We note, however, that the use and effect of an OSHA citation in an intentional tort case appears to be disputed among Ohio's appellate courts. See Vermett v. Fred Christen and Sons Co. (2000),138 Ohio App.3d 586, 603, 741 N.E.2d 954, 966 (refusing to consider an OSHA violation issued after an accident in determining substantial certainty and stating that OSHA does not affect an employer's duty to an employee); Cross v. Hydracrete Pumping Co. (1999), 133 Ohio App.3d 501,507 n. 1, 728 N.E.2d 1104, 1108 (stating that the employee's "attempt to impute actual knowledge through an OSHA violation is misplaced. An OSHA violation might present evidence of negligence."); Feldon v. AshlandChem. Co., Inc. (1993), 91 Ohio App.3d 48, 631 N.E.2d 689, (finding no error with admission of OSHA violations and OSHA investigation file in intentional tort jury trial); Fleck v. Snyder Brick and Block (Mar. 16, 2001), Montgomery App. No. 18368, unreported ("OSHA citations, standing alone, do not demonstrate an intent to injure."); Slack v. Henry (Dec. 1, 2000), Scioto App. No. 00 CA 2704, unreported ("Failure to comply with safety regulations is relevant to show that an employer required an employee to perform a dangerous task, knowing of the substantial certainty of injury."); Floyd v. Master Indus., Inc. (Dec. 10, 1999), Darke App. No. 1489, unreported (disagreeing with employee that an OSHA citation was dispositive of whether the employer committed an intentional tort); Thomas v. Barberton Steel Iron, Inc. (Apr. 1, 1998), Summit App. No. 18546, unreported ("The fact that the company was in violation of relevant safety standards is of no consequence; the company's knowledge of those violations is the determinative factor. There was no evidence before the trial court to establish that the company was aware, prior to the accident, that it was in violation of OSHA standards."); Neil v.Shook (Jan. 16, 1998), Montgomery App. No. 16422, unreported (stating that "prior OSHA violations do not manifest the substantial certainty of harm required, but are only one of many factors to be considered" and that an employer's failure to follow proper safety procedures might be classified as grossly negligent or wanton, but does not constitute an intentional tort); Maddox v. L.O. Warner (Feb. 7, 1996), Montgomery App. No. 15468, discretionary appeal denied (1996), 76 Ohio St.3d 1425,667 N.E.2d 27 (stating that OSHA violations one of many factors to consider in determining employer's intent); Heyman v. Stoneco (Aug. 2, 1991), Wood App. No. 90WD071, unreported ("[T]he disposition of the OSHA citation is irrelevant as to the employer's intent.").
{¶ b} Moreover, in Hernandez v. Martin Chevrolet, Inc. (1995),72 Ohio St.3d 302, 303, 649 N.E.2d 1215, 1216, the Ohio Supreme Court explicitly recognized that "Congress did not intend OSHA to affect the duties of employers owed to those injured during the course of their employment." The court stated:
{¶ c} "* * * * The preamble to OSHA reveals the legislation's intended effect on state law. Section 653(b)(4), Title 29, U.S. Code provides:
{¶ d} `Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.'
{¶ e} This statutory disclaimer clearly indicates that Congress did not intend OSHA to affect the duties of employers owed to those injured during the course of their employment." Id.
{¶ f} Furthermore, as the Ohio Supreme Court has recognized, violations of specific safety regulations "often arise from mere employer negligence, thus precluding intentional tort recovery." State ex rel.Winzeler Excavating Co., Inc. v. Industrial Comm. (1992),63 Ohio St.3d 290, 293, 586 N.E.2d 1087, 1090. The court also has stated that a "wanton disregard of the duty to protect the health and safety of employees * * * [does not] present an act which is substantially certain to occasion injury." Van Fossen, 36 Ohio St.3d at 115,522 N.E.2d at 503.
[24] We note, however, that during those eight days, much other testimony was presented about areas of the plant other than the calendar machine.
[25] {¶ a} We do, however, note our concern with the law regarding jury instructions in an intentional tort case. Fyffe states that once the plaintiff shows the existence of a dangerous process, the remaining two elements depend upon that particular dangerous process:
{¶ b} "(2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such
circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id., paragraph one of the syllabus (Emphasis added.)
{¶ c} If a trial court's jury instructions do refer to the particular dangerous process at issue, can a court be certain or can a court assume that the jury's verdict accounts for this specificity?
{¶ d} Additionally, although we have followed existing case law in our review of this assignment of error, we believe that further scrutiny and review of this issue is warranted. The intentional tort arena presents difficult and complex issues for courts and, obviously, for jurors. If jurors do receive an instruction that defines negligence and recklessness, might this benefit the jury in its task to fully and fairly compare and contrast a defendant's conduct and arrive at an informed conclusion as to the appropriate level or degree of that particular defendant's intent? (i.e. the struggle to determine whether specific facts constitute negligence, recklessness, or an intentional tort (injury substantially likely to occur)).
[26] In its brief, appellant cites Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, 145, 569 N.E.2d 464, 466, as setting forth the proper standard for determining the amount of attorney fees to award. However, Bittner discusses attorney fees in the context of R.C.1345.09(F)(2).
[27] We do not mean to suggest that DR 2-106(B)(8) is an inappropriate factor to consider. To the contrary, many of the cases discussed herein cite to the existence of a contingent fee agreement when determining a reasonable amount of fees to award. We merely point out that this factor was not expressly listed by the Supreme Court in either Villella orHutchinson when determining fees in the context of an award of punitive damages.
[28] When the Landis case was remanded for a determination of reasonable attorney fees, the trial court rejected altogether any consideration of the contingent fee agreement when analyzing the factors under DR 2-106(B). See Landis v. Grange Mut. Ins. Co. (1999),100 Ohio Misc.2d 31, 40, 717 N.E.2d 1199, 1206.